THE STATE OF OHIO, APPELLEE, *v*. HAINES, APPELLANT.

[Cite as *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711.]

*Criminal law — Battered woman syndrome — Admissibility during state's case-in-chief — Evidence of battered woman syndrome admissible to demonstrate the victim's state of mind when the victim's credibility has been challenged upon cross-examination.*

(Nos. 2005-0853 and 2005-0959 – Submitted February 22, 2006 – Decided December 28, 2006.)

APPEAL from and CERTIFIED by the Court of Appeals for Lake County, No. 2003-L-035, 2005-Ohio-1692.

_____

**PFEIFER, J.**

{¶ 1} On January 24, 2003, a jury in the Lake County Court of Common Pleas found appellant Bryan Haines guilty of multiple counts of kidnapping, abduction, and domestic violence. All of the counts related to the same victim, Haines's live-in girlfriend, Jacqueline Bohley, and arose from incidents that occurred in March and April 2002. This case concerns whether the trial court properly admitted expert testimony regarding battered woman syndrome as part of the state's case-in-chief.

{¶ 2} Haines and Bohley met on December 26, 1997. By July 1998, they had begun living together in the home of Haines's brother, Ryan, and in January 2000, they moved into a condominium that Bohley had purchased. Bohley described the relationship as rocky and testified that Haines did not allow her to have friends or much freedom. She had to wear a pager so that he could always reach her. Haines timed how long Bohley's trip between home and work should take and required her to phone him upon leaving for work and arriving at

work.  If she was late, he would get very angry, and a fight would ensue. Bohley was called into her boss's office at least three times because her telephone arguments with Haines disrupted her work.  Haines also demanded constant contact regarding Bohley's whereabouts outside of work.  Bohley said that she complied in order to avoid arguments.

{¶ 3}  On May 6, 2001, Bohley and Haines became engaged.  On October 8, 2001, Bohley went to police to report an incident of domestic violence that had occurred on October 4, 2001.  Haines was convicted of a domestic violence charge and served 18 days in jail.  Bohley ended their engagement and got a temporary protection order against Haines.

{¶ 4}  On cross-examination, Bohley testified that she was soon seeing Haines again.  His 18-day jail term was work-release (Haines spent only evenings in jail), and Bohley would visit him during the day.  Later, Haines served a period of house arrest at his brother's home, and Bohley visited him there, too, occasionally spending the night and engaging in sexual relations.  Bohley never removed all of Haines's possessions from her home, and by late January 2002, they were again living together in Bohley's condominium.

{¶ 5}  The first event leading to the charges in this case occurred on Easter Sunday, March 31, 2002.  Bohley found a card to Haines from another woman when she was putting away some of his belongings; she went outside to confront him about it.  Haines suggested that they go inside the house to discuss the matter, and Bohley complied.  When then were both inside, Haines locked the door and the deadbolt.  Haines told Bohley that he would be moving out, but only when he wanted to, and that it could take a year for him to do so.  Bohley said that she would no longer be sleeping with him in the same bed, which infuriated Haines.  Haines picked up a piece of baseboard left from a remodeling project and struck Bohley on the arms and legs.  He then began breaking objects in the house. Bohley tried to escape by running through a sliding glass door, but she was unable

to break the glass. In an effort to divert Haines's attention, Bohley slit her wrist with a piece of broken glass. She drew blood, and Haines did show some concern and helped her wrap the wrist.

{¶ 6} After helping Bohley with her wrist, Haines told her that he was going to show her what it was like to be in jail and ordered her into her condominium's crawlspace. His jail sentence had become a consistent theme in their relationship, and he said that he would make her stay in the crawlspace for 18 days. Bohley entered the crawlspace, which was about three feet high and had a lid, feeling like she had no other choice. The lid had a hole in it, and Haines ordered Bohley to keep her finger through the hole at all times so that he could be sure she was not trying to escape. Haines screwed eight screws into the lid once she was inside. Periodically, he checked to see if her finger was still in the hole, and then released her after 30 to 45 minutes. Haines was upset and crying when he released Bohley and asked her to pray with him. She prayed with him and told him she forgave him in order to appease him.

{¶ 7} After the prayer, Haines told Bohley that they were going to take an Easter gift to his daughter. While driving home from making that delivery, Haines became agitated again, and when they arrived back home, Bohley refused to leave the vehicle. Haines told her that she could trust him and that he would not hurt her if she went inside the house, so Bohley reluctantly accompanied him inside. Once inside, he locked the doors and told her that she was going to die that night. Bohley screamed, and Haines covered her mouth and nose. He punched and then kicked Bohley in the ribs and stepped on her ankle. After that, they went to bed.

{¶ 8} The next day, Bohley told Haines's family members what had happened the night before. That evening, Haines and Bohley met with his father to discuss the situation. They all agreed that Haines should move out of Bohley's condominium.

**{¶ 9}** Upon cross-examination regarding the March 31 incident, Bohley testified that she and Haines had engaged in sexual relations that evening. She also testified that she had gone to the emergency room on April 5 to have her painful ribs checked, but that she had lied to the people caring for her about the cause of her injury, claiming that she had fallen over a fence while rollerblading. Haines's counsel also elicited testimony from Bohley on cross-examination that she did not tell any of her co-workers or any doctors what had happened on March 31, 2002, and that she did not report that incident to police until after the April 18 incident.

**{¶ 10}** Despite the earlier agreement that Haines would move out, he did not, and the situation deteriorated. In the early evening of April 17, 2002, Haines and Bohley engaged in what she called "abnormal" sexual relations involving the Internet, which Bohley said Haines knew disgusted her. Haines immediately left the house for a couple of hours. When he returned at about 10:30, he was upset. He blamed Bohley for his jail term and wanted her to apologize. For self-preservation, she told him what he wanted to hear. Haines twisted her wrist and stuck his fingers in her eyes. He ripped her nightgown and got a belt from the closet, commenting that he was going to hit her like a child with the belt because that was the only way she would understand that what she had done was wrong. He told he to lie on her stomach, and he hit her five times on the buttocks with the belt.

**{¶ 11}** Haines became concerned that Bohley might tell someone what had happened and began swinging the belt again with more force. He hit her multiple times in the shoulder and arm. He then cried out that Bohley had ruined his life, and she comforted him in an effort to diffuse the situation. He took some sleeping pills, but before he fell asleep, he told her to keep her hand on him at all times so that he would know whether she was trying to get away. He allowed her to go to the bathroom, but warned her to not try to go downstairs.

{¶ 12} The next morning, Haines refused to allow Bohley to go to work. Fearing that her work colleagues would be concerned by her absence, Haines directed Bohley to phone the office and leave a message. As she made the call, Haines held his fist against her face. Soon after, Haines ordered Bohley to place another call to work, begging to not be fired. Haines held a knife to her throat as she made that call.

{¶ 13} During her initial call to work, Bohley left a message using a pre-arranged code-phrase, "Red Eye Printing," to indicate to her co-workers that she was in trouble. On her message, she asked her co-workers to check the "Red Eye Printing" envelope on her desk. The co-workers opened the envelope, which contained a document that gave instructions to call the police. Bohley's co-workers called police, and officers arrested Haines at the condominium.

{¶ 14} The state called as its last witness in its case-in-chief Dr. James Eisenberg, a board-certified forensic psychologist. His testimony is at the crux of this case. Dr. Eisenberg testified about battered woman syndrome, stating that "it refers to a woman * * * that is the subject of repeated psychological, physical, or sexual abuse by one's partner. The syndrome itself speaks to the individuals who remain in relationships in spite of those beatings." He explained the syndrome's three-part process – the tension stage, the acute battering stage, and the stage of contrition. He stated that the batterer exerts extreme control over the woman's entire life, leading to her isolation. He explained that a woman in a relationship with a batterer sees the world "through a very small opening and all that she sees is this guy. * * * The threat is always there, whether you leave or whether you stay. * * * So the threat is always there, it doesn't matter if they go anywhere. [She thinks], If I leave he's gonna beat me. If I stay he's gonna beat me. Let me just – let's just get it out."

{¶ 15} Eisenberg spoke mostly in generalities about battered woman syndrome and its symptoms. Toward the end of his direct examination, however, the following exchange occurred:

{¶ 16} "Q. Now, Doctor, in this particular case, are you familiar with some of the facts and circumstances surrounding the criminal charges in this case?

{¶ 17} "A. Yes.

{¶ 18} "Q. All right. And as a result of that, do you have an opinion, within a reasonable degree of forensic certainty, as to whether or not you see any features of the investigation of this case that would parallel a Battered Woman's Syndrome?

{¶ 19} "Mr. M. DiCello: Objection.

{¶ 20} "Judge Lucci: Overruled.

{¶ 21} "A. Yes.

{¶ 22} "Q. Okay. And what is - is that opinion within a reasonable degree of forensic certainty?

{¶ 23} "A. Yes.

{¶ 24} "Q. And what is that opinion?

{¶ 25} "A. My opinion is that, as I understand the facts of the case, and again I'm not a fact finder, but as I understand the facts of the case in front of us, and from my review of the records, it's very consistent with what we see in a Battered Woman's Syndrome scenario."

{¶ 26} The jury returned a verdict convicting Haines of all seven counts with which he was charged – kidnapping, abduction, and domestic violence relating to the March 31, 2002 incident; kidnapping, abduction, and domestic violence relating to the incident of April 17, 2002; and one count of kidnapping relating to the events of the morning of April 18, 2002.

{¶ 27} Haines appealed. The Lake County Court of Appeals reversed one of the kidnapping convictions relating to the April 17-18 incident, holding that the

two counts resulted from an act that constituted a single course of conduct. Haines sought reversal on all counts due to the trial court's admission of Eisenberg's testimony regarding battered woman syndrome, arguing that such evidence was "irrelevant, prejudicial, inflammatory, and prohibited by the Ohio Legislature, the Supreme Court of Ohio and this honorable appeals court." The court affirmed the trial court's admission of the testimony, stating that "[t]his testimony regarding battered woman syndrome was properly admitted to explain the victim's state of mind, i.e., why she continued to return to appellant. This was quite relevant, as it went to her credibility, which had been challenged." The court further held that the testimony complied with Evid.R. 403(A) because its probative value was not outweighed by the danger of unfair prejudice and that it did not constitute "other acts" evidence prohibited by Evid.R. 404(B).

{¶ 28} The appellate court certified that its decision conflicted with the decision of the Fifth Appellate District in *State v. Pargeon* (1991), 64 Ohio App.3d 679, 582 N.E.2d 665. This court granted jurisdiction by accepting a discretionary appeal and determining that a conflict as to the following question existed: "When the victim's credibility is challenged upon cross-examination during the state's case-in-chief, may the state introduce evidence of battered woman syndrome to demonstrate the victim's state of mind, i.e., to explain why she returned to the defendant despite his aggressions toward her?"

Law and Analysis

{¶ 29} In *State v. Koss* (1990), 49 Ohio St.3d 213, 551 N.E.2d 970, this court first recognized the admissibility of expert testimony regarding battered woman syndrome. In that case, the defendant had killed her husband, and the testimony regarding battered woman syndrome was offered by the defendant in support of her affirmative defense of self-defense. Today's certified question asks whether that holding should be extended to allow expert testimony concerning battered woman syndrome in the state's case-in-chief to help a jury understand a

victim's reaction to abuse in relation to her credibility. We hold that such testimony is admissible.

{¶ 30} In allowing the admission of expert testimony regarding the battered woman syndrome in *Koss*, this court "[did] not establish a new defense or justification." *Koss*, 49 Ohio St.3d at 217, 551 N.E.2d 970. Rather, such testimony was allowed as evidence to prove one element of self-defense. "In Ohio, to prove self-defense it must be established that the person asserting this defense had ' * * * a *bona fide belief* that he [she] was in imminent danger of death or great bodily harm and that his [her] only means of escape from such danger was in the use of such force.' (Emphasis added.) " (Bracketed material sic.) *Koss*, 49 Ohio St.3d at 215, 551 N.E.2d 970, quoting *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of the syllabus. *Koss* recognized that since Ohio has a subjective test to determine whether a defendant properly acted in self-defense, the defendant's state of mind is a crucial issue. *Koss*, 49 Ohio St.3d at 215, 551 N.E.2d 970.

{¶ 31} In *Koss,* this court considered whether testimony on battered woman syndrome would assist the trier of fact in finding the truth and whether, pursuant to Evid.R. 702, such testimony provided "specialized knowledge" that would "assist the trier of fact to understand evidence or to determine a fact in issue," particularly, the defendant's state of mind. The court concluded:

{¶ 32} "Expert testimony regarding the battered woman syndrome can be admitted to help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense. 'Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any "common sense" conclusions by the jury that if the beatings were really that bad the woman would

have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage. See Walker, The Battered Woman, 19-31 (1979).' *State v. Hodges* (1986), 239 Kan. 63, 68-69, 716 P.2d 563, 567. See, also, *Smith v. State* [1981]*, 247 Ga. [612,] 618-619, 277 S.E.2d [678]; *Hawthorne* [*v. State* (Fla.App.1982), 408 So.2d 801]*; [People v.] Torres* [1985], 128 Misc.2d [129,] 133-134, 488 N.Y.S.2d [358]." *Koss*, 49 Ohio St.3d at 216, 551 N.E.2d 970.

{¶ 33} *Koss* overruled *State v. Thomas* (1981), 66 Ohio St.2d 518, 521, 20 O.O.3d 424, 423 N.E.2d 137, in which this court had held that expert testimony relating to battered woman syndrome "is inadmissible because it is not distinctly related to some science, profession or occupation so as to be beyond the ken of the average lay person." In *Koss,* this court noted that the development of the scholarship on battered woman syndrome had increased since *Thomas* and that other courts had begun to allow testimony on the syndrome. *Koss*, 49 Ohio St.3d at 215, 551 N.E.2d 970. The court wrote, "We believe that the battered woman syndrome has gained substantial scientific acceptance to warrant admissibility." *Koss*, 49 Ohio St.3d at 217, 551 N.E.2d 970. The court also revisited its holding from *Thomas* that battered-woman-syndrome testimony was not so distinctly related to science that it is beyond the ken of the jury:

{¶ 34} " 'The difficulty with the expert's testimony is that it *sounds* as if an expert is giving knowledge to a jury about something the jury knows as well as anyone else, namely, the reasonableness of a person's fear of imminent serious danger. That is not at all, however, what this testimony is *directly* aimed at. It is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion, an area where expert knowledge would enable the jurors to disregard their prior conclusions as being common myths

rather than common knowledge.' (Emphasis sic). " Id., citing *State v. Kelly* (1984), 97 N.J. 178, 206, 478 A.2d 364.

**{¶ 35}** Thus, this court in *Koss* concluded that expert testimony on battered woman syndrome is admissible pursuant to Evid.R. 702: "Where the evidence establishes that the woman is a battered woman, and when an expert is qualified to testify about the battered woman syndrome, expert testimony concerning the syndrome may be admitted to assist the trier of fact in determining whether the defendant acted in self-defense." *Koss*, 49 Ohio St.3d at 218, 551 N.E.2d 970.

**{¶ 36}** The same year of this court's decision in *Koss*, the General Assembly enacted R.C. 2901.06, which recognizes the value of battered-woman-syndrome testimony and sets forth that it may be employed in self-defense cases:

**{¶ 37}** "(A) The general assembly hereby declares that it recognizes both of the following, in relation to the 'battered woman syndrome:'

**{¶ 38}** "(1) That the syndrome currently is a matter of commonly accepted scientific knowledge;

**{¶ 39}** "(2) That the subject matter and details of the syndrome are not within the general understanding or experience of a person who is a member of the general populace and are not within the field of common knowledge.

**{¶ 40}** "(B) If a person is charged with an offense involving the use of force against another and the person, as a defense to the offense charged, raises the affirmative defense of self-defense, the person may introduce expert testimony of the 'battered woman syndrome' and expert testimony that the person suffered from that syndrome as evidence to establish the requisite belief of an imminent danger of death or great bodily harm that is necessary, as an element of the affirmative defense, to justify the person's use of the force in question. The introduction of any expert testimony under this division shall be in accordance with the Ohio Rules of Evidence."

**{¶ 41}** The General Assembly also enacted R.C. 2945.392, which allows battered-woman-syndrome testimony to be admitted by a defendant that pleads not guilty by reason of insanity.

**{¶ 42}** *Koss* and R.C. 2901.06(A) establish that battered-woman-syndrome testimony meets the requirements of Evid.R. 702 in regard to scientific validity and the requirement of specialized knowledge. Neither *Koss* nor R.C. 2901.06 nor R.C. 2945.392 limits the use of such testimony to self-defense or insanity cases. *Koss* and the statutes do recognize that testimony on the syndrome is properly admitted pursuant to Evid.R. 702 as expert testimony that can assist the trier of fact in search of the truth. *Koss*, 49 Ohio St.3d at 216, 551 N.E.2d 970. But admissibility under Evid.R. 702 is only part of the picture — as R.C. 2901.05 and 2945.392 both require, any battered-woman-syndrome testimony must be admitted in conformance with the Ohio Rules of Evidence. Thus, our consideration of admissibility does not end with Evid.R. 702.

**{¶ 43}** Further consideration is especially needed when the testimony is not offered by a defendant, but by the state against a defendant. Prior to 1990, "appellate courts in only a handful of jurisdictions had considered whether prosecutors may use expert testimony on battering and its effects in a domestic violence prosecution," but since that time, the courts in an overwhelming majority of jurisdictions that have considered the issue have held that such evidence is admissible under the proper circumstances. Rogers, Prosecutorial Use of Expert Testimony in Domestic Violence Cases: from Recantation to Refusal to Testify (1998), 8 Colum.J.Gender & L. 67, 68. See, also, Barnes, Annotation, Admissibility of Expert Testimony Concerning Domestic-Violence Syndromes to Assist Jury in Evaluating Victim's Testimony or Behavior (2006), 57 A.L.R.5th 315, Section 2(a). The courts that have held admissible expert testimony regarding battered woman syndrome have so held "while operating under rules of evidence that mirror Ohio's." Hawes, Removing the Roadblocks to Successful

Domestic Violence Prosecutions: Prosecutorial Use of Expert Testimony on the Battered Woman Syndrome in Ohio (2005), 53 Clev.St.L.Rev. 133, 144. We find the holdings of those other courts instructive.

{¶ 44} Relevance under Evid.R. 401 is the first hurdle to clear. "Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse." *People v. Christel* (1995), 449 Mich. 578, 580, 537 N.W.2d 194. Such seemingly inconsistent actions are relevant to a witness's credibility. "Because the victim's credibility can be attacked during cross-examination of the victim or even during opening statements, the prosecution need not wait until rebuttal to present expert testimony on battered woman syndrome. Rather, such testimony may be presented as rehabilitative evidence during the state's case-in-chief." *State v. Grecinger* (Minn.1997), 569 N.W.2d 189, 193.

{¶ 45} In this case, Bohley's behavior after incidents of alleged abuse was a focus of Haines's cross-examination. During cross-examination of Bohley, Haines attempted to demonstrate that Bohley would become intimate with Haines after he allegedly abused her, that she broke off their relationship only temporarily, that she did not report the abuse, and that she gave differing explanations regarding some of her injuries. In short, the testimony tended to show that Bohley not only never reported the abuse but that she remained in the relationship.

{¶ 46} For the reasons stated in *Koss*, expert testimony on battered woman syndrome could address those supposed anomalies. But, while such testimony can be relevant for explaining a victim's behavior, it cannot be considered relevant if there is no evidence that the victim suffers from battered woman syndrome. "Expert testimony on the subject of battered woman's

12

syndrome is not relevant unless there is some evidentiary foundation that a party or witness to the case is a battered woman, and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior." *State v. Borrelli* (1993), 227 Conn. 153, 172, 629 A.2d 1105, fn. 15, citing *Koss*, 49 Ohio St.3d at 218, 551 N.E.2d 970.

{¶ **47**} Like the court in *State v. Stringer* (1995), 271 Mont. 367, 378, 897 P.2d 1063, we hold that a set of rigid foundational requirements is unnecessary but that "the party seeking to introduce battered woman syndrome evidence must lay an appropriate foundation substantiating that the conduct and behavior of the witness is consistent with the generally recognized symptoms of the battered woman syndrome, and that the witness has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior."

{¶ **48**} Evidence generally establishing the cycles of a battering relationship is an appropriate foundation for battered-woman-syndrome expert testimony. "The battering relationship itself is often described as cyclical in nature, with three distinct phases: tension building, confrontation, and contrition. During the 'tension building' phase, the woman is generally compliant, often feeling as though she deserves the abuse. Once the tension reaches a boiling point, the batterer will erupt uncontrollably, committing a violent act. Next, in an abrupt about-face, the abuser will exhibit seemingly intense love and affection towards his victim. The victimized women are then led to believe that the violence was an isolated incident and that it will not continue. This cycle of violence may leave the victim with feelings of learned helplessness, low self-esteem, depression, minimization techniques, self-isolation, and passivity." (Footnotes omitted.) Hawes, 53 Clev.St.L.Rev. at 137.

{¶ **49**} Further, as this court held in *Koss*, " 'in order to be classified as a battered woman, the couple must go through the battering cycle at least twice.

Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman.' " *Koss*, 49 Ohio St.3d at 216, 551 N.E.2d 970, quoting Walker, The Battered Woman (1979) xv.

{¶ 50} The evidence against Haines generally established the cycles of a battering relationship. The prosecution established through testimony about the October 2001 incident and the March 2002 incident that Haines's psychological abuse and controlling behavior were followed first by an outburst of violence and then by Haines's supposed regret and a reconciliation. The admission or exclusion of relevant evidence rests within the sound discretion of the trial court, *State v. Robb* (2000), 88 Ohio St.3d 59, 68, 723 N.E.2d 1019, and the trial court did not abuse that discretion in finding that expert testimony on battered woman syndrome was relevant in this case.

{¶ 51} Haines argues that, even if relevant, the battered-woman-syndrome testimony violated Evid.R. 404(B), which states:

{¶ 52} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 53} First, testimony on battered woman syndrome is not offered to prove anything about the defendant, but is instead offered as background for understanding the victim's behavior. Second, the foundation testimony employed in this case did not constitute "other acts" evidence. All three incidents comprising the bulk of the state's foundation evidence — the October 2001 incident, the March 31, 2002 incident, and the April 17-18 incident — were central to the charges against Haines. The domestic violence counts against Haines required a prior conviction in order to be charged as felonies, and the

14

parties had stipulated that Haines had been convicted of domestic violence for the October 2001 incident. That conviction was made known to the jury from the outset, during the trial judge's pretrial instructions. The other two incidents were the focus of the trial.

{¶ 54} Haines argues that even the term "battered woman syndrome" suggests that the accused committed other crimes, wrongs, or acts. We believe that this issue is more properly addressed by considering the possible prejudicial nature of the testimony. Even when its relevance is shown through a proper foundation, a court must carefully weigh whether the expert testimony violates Evid.R. 403(A), which states, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 55} An expert witness who diagnoses a victim as a battered woman essentially concludes that the defendant is a batterer. In a case where the underlying charges involve domestic violence, such a conclusion by an expert witness is prejudicial to the defendant and usurps the jury's role as finder-of-fact. A diagnosis can prejudice a defendant further because the expert is presenting a conclusion regarding the victim's credibility, which again is a conclusion to be made by the jury. In cases where domestic violence is not the underlying charge, but battered-woman-syndrome testimony is offered to explain the conflicting statements or activities of a witness, a defendant can again be prejudiced by being labeled as a batterer. Thus, courts must carefully balance the admission of expert testimony on battered woman syndrome under Evid.R. 403.

{¶ 56} An acceptable balance is best achieved through a tailoring of the expert's testimony. Limitations placed upon the expert's testimony – "the expert cannot opine that complainant was a battered woman, may not testify that defendant was a batterer or that he is guilty of the crime, and cannot comment on whether complainant was being truthful"— dispel concerns about unfair

prejudice. *Christel*, 449 Mich. at 591, 537 N.W.2d 194. The rule in most jurisdictions is that general testimony regarding battered woman syndrome may aid a jury in evaluating evidence and that if the expert expresses no opinion as to whether the victim suffers from battered woman syndrome or does not opine on which of her conflicting statements is more credible, such testimony does not interfere with or impinge upon the jury's role in determining the credibility of witnesses. *State v. Townsend* (2006), 186 N.J. 473, 496-498, 897 A.2d 316. "[T]he prosecutorial introduction of testimony on the battered woman syndrome must be in accordance with the applicable Ohio Rules of Evidence. The best way to approach this is by utilizing the limited format advocated by the courts in [*State v. Ciskie* (1988), 110 Wash.2d 263, 751 P.2d 1165] and [*Arcoren v. United States* (C.A.8, 1991), 929 F.2d 1235]. Under this approach, experts who are called to testify in domestic violence prosecutions must limit their testimony to the general characteristics of a victim suffering from the battered woman syndrome. The expert may also answer hypothetical questions regarding specific abnormal behaviors exhibited by women suffering from the syndrome, but should never offer an opinion relative to the alleged victim in the case." Hawes, Clev.St.L.Rev. at 158.

{¶ 57} Trial courts should tailor the scope of the state's questioning and should also ensure that jurors are instructed as to the limits of the expert's testimony. The trial court failed to do so in this case, and the direct examination of the battered-woman-syndrome expert crossed the line. The prosecutor asked Dr. Eisenberg, "[D]o you have an opinion, within a reasonable degree of forensic certainty, as to whether or not you see any features of the investigation of this case that would parallel a Battered Woman's Syndrome?" Haines's counsel objected to the question; the trial court overruled the objection. Eisenberg responded, "My opinion is that, as I understand the facts of the case, and again I'm not a fact finder, but as I understand the facts of the case in front of us, and

from my review of the records, it's very consistent with what we see in a Battered Woman's Syndrome scenario."

{¶ 58} The prosecutor's question essentially solicited a diagnosis, and the doctor's response provided one. A reasonable juror would conclude that Eisenberg believed that Bohley suffered from battered woman syndrome. Such testimony went beyond the providing of a context for a witness's testimony into the area of determining credibility. The testimony also went to the very conclusion that the jury was asked make – whether Haines committed domestic violence against Bohley – and answered it.

{¶ 59} Defendant's counsel then elicited more testimony from Eisenberg that called for a specific diagnosis of Bohley as well as a discussion of further facts about her. Eisenberg testified on cross-examination that he had diagnosed Bohley with "Posttraumatic Stress Disorder secondary to the Battered Woman's Syndrome." He testified that he was familiar with the facts and circumstances surrounding the criminal charges in this case, and he testified that he had reviewed the prior treatment records from Ms. Bohley's therapist, documents left at her place of employment, the police reports, letters from Mr. Haines to Ms. Bohley, the psychological testing that had been done on Ms. Bohley, and a document called "Recorded Acts," described by Eisenberg as "a stack of dates in which Ms. Bohley had listed incidents of violence in the last three or four years in the relationship."

{¶ 60} Defense counsel also asked whether, in considering Bohley's history, Eisenberg concluded that the abuse had occurred. After answering, "Yes, I did," Eisenberg later added, "I'm assuming that it occurred. I'm not the fact finder. My assumption is that it occurred based on the history, the evaluation of Ms. Bohley, her credibility in taking the psychological testing. So all those things led to my assumption that they did occur. I don't know if they actually did."

{¶ 61} The state argues that the bulk of the battered-woman-syndrome testimony that addresses Bohley's specific case was brought to light by Haines. However, the key testimony solicited by the state thrust Haines into the situation where he had to defend himself against a diagnosis. The evidence admitted in cross-examination did not change the fact that Eisenberg's testimony on direct examination was prejudicial.

{¶ 62} The state argues that admission of the testimony from Eisenberg specifically tying Bohley to battered woman syndrome constituted harmless error. Haines's counsel did object to Eisenberg's diagnostic testimony on direct examination, and thus a harmless-error analysis, rather than a plain-error analysis, is appropriate. "Whether [the] error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78.

{¶ 63} Haines was charged with multiple counts based upon the events of March 31, 2002 and April 17-18, 2002. Counts One through Three relate to the incident on March 31, 2002. The evidence regarding that incident is almost entirely based upon Bohley's testimony and therefore relies on her credibility. Bohley did not report that incident to the police for weeks. She continued to reside with Haines after it occurred. There is a reasonable probability that evidence concerning her credibility might have contributed to the jury's verdict on those counts — a juror might question Bohley's response to the abuse and then find a consistent explanation for it in Eisenberg's testimony. We thus find that the trial court's error in admitting Eisenberg's testimony attributing battered woman syndrome to Bohley was not harmless as to Counts One through Three.

{¶ 64} The evidence concerning the counts relating to the incident of April 17-18 was more varied. The jury saw photographs of Bohley's injuries,

18

heard testimony from her co-workers regarding her telephone calls to her office on the morning of April 18, and heard testimony from the police officers responding to the scene. Jurors were not confronted with questions about why Bohley had not reported the incident, as they were with the March 31, 2002 incident. Thus, we find Eisenberg's testimony harmless beyond a reasonable doubt on Counts Four through Six; there is not a reasonable possibility that his testimony contributed to those convictions.

{¶ 65} Thus, we affirm in part and reverse in part the holding of the appellate court. In regard to the certified question, we respond in the affirmative and hold that when a victim's credibility is challenged upon cross-examination during the state's case-in-chief, the state may introduce expert testimony regarding battered woman syndrome to aid the trier-of-fact in determining the victim's state of mind, e.g., to explain why she returned to the defendant despite his aggressions toward her.

Judgment affirmed in part
and reversed in part,
and cause remanded.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

LANZINGER, J., dissents.

_____

**LANZINGER, J., dissenting.**

{¶ 66} I dissent from the majority's holding allowing the state's use of battered woman syndrome in its case-in-chief as an unwarranted extension of *State v. Koss (1990), 49 Ohio St.3d 213, 551 N.E.2d 970.* In *Koss,* which authorized the presentation of the battered woman's syndrome by a defendant to establish self-defense, this court noted: "A *defendant* attempting to admit expert testimony regarding the battered woman syndrome must offer evidence which

establishes herself as a 'battered woman.' " (Emphasis added.) Id., paragraph two of the syllabus. Furthermore, "[a]dmission of expert testimony regarding the battered woman syndrome does not establish a new defense or justification. It is to assist the trier of fact to determine *whether the defendant acted* out of an honest belief that she is in imminent danger of death or great bodily harm and that the use of such force was her only means of escape." (Emphasis added.) Id., paragraph three of the syllabus.

{¶ 67} The General Assembly codified similar limitations on the admission of the battered woman syndrome when it enacted R.C. 2901.06(B), which states: "*If a person is charged* with an offense involving the use of force against another *and the person*, as a defense to the offense charged, *raises the affirmative defense of self-defense,* the *person may introduce expert testimony of the 'battered woman syndrome'* and expert testimony that the person suffered from that syndrome as evidence to establish the requisite belief of an imminent danger of death or great bodily harm that is necessary, *as an element of the affirmative defense*, *to justify the person's use of the force* in question. The introduction of any expert testimony under this division shall be in accordance with the Ohio Rules of Evidence." (Emphasis added.)

{¶ 68} It is mystifying that the majority cannot see the limiting language within *Koss* and the statute. Other appellate courts have held that expert testimony regarding the battered woman syndrome can be admitted by a defendant only when the affirmative defense of self-defense has been raised. See *State v. Pargeon* (1991), 64 Ohio App.3d 679, 582 N.E.2d 665; *State v. Sonko* (May 22, 1996), 9th Dist. No. 95CA006181; *State v. Dowd* (Jan. 19, 1994), 9th Dist. No. 93CA005638; *State v. Lundgren (Apr. 22, 1994), 11th Dist. No. 90-L-15-125*.

{¶ 69} This is not a situation of admitting rebuttal evidence under Evid.R. 404(A)(2). In the hands of the state during its case-in-chief, an expert witness

who presents the battered woman syndrome as evidence does more than bolster the credibility of the victim. The witness establishes prior bad acts of the defendant from which the jury may infer that he had the propensity to engage in those acts and acted in accord with that propensity on the current charge. This is precisely the inference Evid.R. 404(B) excludes: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Furthermore, expert witnesses may have particular power over the minds of jurors. Perhaps recognizing this, the *Koss* court limited the use of testimony concerning the battered woman syndrome to cases where defendants employ it in establishing self-defense.

{¶ 70} The majority opinion acknowledges the prejudice to the defendant that occurs through this new evidentiary expansion. "An expert witness who diagnoses a victim as a battered woman essentially concludes that the defendant is a batterer. In a case where the underlying charges involve domestic violence, such a conclusion by an expert witness is prejudicial to the defendant and usurps the jury's role as finder-of-fact." ¶ 55. Yet in spite of this understanding, because it can "aid the trier-of-fact in determining the victim's state of mind, e.g., to explain why she returned to the defendant despite his aggressions toward her," expert testimony on battered woman syndrome is allowed. ¶ 65. Even if an expert is confined to providing only a general overview of the syndrome, as we see in this case, the bounds are easy to overstep. Dr. Eisenberg did more. He gave an opinion, to a reasonable degree of forensic certainty, that the facts of the case were "very consistent with what we see in a Battered Woman's Syndrome scenario."

{¶ 71} The majority's expansion of *Koss* and *R.C. 2901.06(B)* is justified by citations to other jurisdictions and secondary sources. A more liberal admission of expert testimony of this nature may be a worthy goal, but until the General Assembly determines it to be good policy for Ohio, I believe we should

follow precedent as it stands and the statute as it is written. I would hold that the state may not introduce evidence of battered woman syndrome to demonstrate the victim's state of mind, i.e., to explain why she returned to the defendant despite his aggressions toward her, when her credibility is challenged upon cross-examination.

**{¶ 72}** To do otherwise is to transform a shield for the defense into a sword for the prosecution. I would answer no to the certified question.

_____

Charles Coulson, Lake County Prosecuting Attorney, and Karen A. Sheppert, Assistant Prosecuting Attorney, for appellee.

Ian N. Friedman & Associates, L.L.C., Ian N. Friedman, John A. Powers, Ronald L. Frey, and Erik S. Dunbar, for appellant.

Jason A. Macke, urging reversal for amicus curiae, Ohio Association of Criminal Defense Lawyers.

_____