DECISION. *Page 2 
{¶ 1} Ernest Gibbs died in July 2002 from an exceptionally rare fungal disease, cryptococcal meningitis. Delores Gibbs, Ernest's wife, individually and as the administrator of Gibbs's estate, sued several doctors who had treated Gibbs. She alleged that delayed diagnosis had caused Gibbs's death.
 {¶ 2} A jury trial ended with a unanimous verdict for the defense. Mrs. Gibbs has appealed, arguing that she had a right to impeach a defense expert by using a learned treatise, and that three jurors should have been excused for cause. We hold that the trial court did not commit reversible error; therefore, we affirm its judgment.
 I. A Rare Disease, with Vague Symptoms {¶ 3} Ernest Gibbs was not a complainer. But when Gibbs had a severe headache that pain relievers did not address, he went to the emergency room for help.
 {¶ 4} Doctors eventually discovered that Gibbs had cryptococcal meningitis, a rare fungal disease. The only definitive test for this disease is a lumbar puncture, more commonly known as a spinal tap. Spinal taps are not administered often, unless the patient's symptoms indicate an infection in the brain or the spine. Gibbs's doctors did not administer a spinal tap until fourteen days after he had first come to the emergency room.
 II. May 12-16: the First Admission {¶ 5} On May 12, after suffering from a severe headache for four days, Gibbs went to the hospital. The emergency-room doctor performed diagnostic tests. The tests were inconclusive, so Dr. Timothy McCarren admitted Gibbs to the hospital. *Page 3 
 {¶ 6} Gibbs had some difficulty with his balance, possibly due to dehydration, but he was alert and, according to most testimony, spoke fluently. He had tenderness in his temporal area, which was a symptom of temporal arteritis, the inflammation of the temporal artery. But Gibbs did not have a fever, a stiff neck, an elevated white blood cell count, or a skin rash — all signs of infection, particularly meningitis.
 {¶ 7} McCarren gave Gibbs pain medication, blood tests, and a CT scan. He called for a neurological consultation, ordered an MRI, and sent for a sedimentation-rate test, which helps to diagnose temporal arteritis. After May 12, McCarren had no contact with Gibbs, and the court granted a directed verdict for McCarren at trial.
 {¶ 8} On both May 13 and May 14, Dr. Colin Zadikoff, the neurological consultant, examined Gibbs and found no abnormalities. Zadikoff specifically checked Gibbs's neck for stiffness. Gibbs's neck was normal. Zadikoff did not see Gibbs again during his first stay at the hospital.
 {¶ 9} Dr. Walter Donnelly, Gibbs's personal physician for ten years, saw Gibbs on May 13, 15, and 16. Dr. Thaddeus Bort also cared for Gibbs.
 {¶ 10} After the team of doctors received Gibbs's sedimentation test results, they suspected that he had temporal arteritis and ordered a biopsy. Temporal arteritis can rapidly lead to blindness, so Donnelly started Gibbs on a steroid to treat the disease before he received the results of the biopsy.
 {¶ 11} On May 16, Donnelly discharged Gibbs. He testified that Gibbs was back to normal, his headache was mostly gone, and there had been no evidence of a fever.
 {¶ 12} During the first admission, Gibbs underwent two CT scans, one MRI, extensive blood work, examinations by doctors in various specialties, a temporal biopsy, *Page 4 
and temperature checks at least three times daily. None of the many doctors who treated Gibbs during the first admission had suggested that a spinal tap was indicated.
 III. May 20: the Second Admission {¶ 13} Gibbs's hiatus from feeling sick was short-lived. Mrs. Gibbs called Donnelly's office a few times on May 20 and eventually took Gibbs by life squad to the emergency room. He was suffering from confusion, weakness on one side of his body, and a headache, though the headache was less severe than was the case during the first admission.
 {¶ 14} The doctors suspected steroid psychosis, which leads to mental confusion. They also considered the possibility of a stroke. Gibbs's condition improved after being taken off steroids.
 {¶ 15} On the evening of May 25, Gibbs lost consciousness and spiked a fever. Since a fever is a sign of infection, doctors performed a spinal tap on Gibbs the next morning. The results showed that Gibbs had cryptococcal meningitis, a disease that is fatal if not treated. He did not respond to several weeks of treatment and died in July.
 {¶ 16} During his two admissions, before his spinal tap, Gibbs was seen by family doctors, a neurologist, a psychiatrist, a rheumatologist, a radiologist, and a vascular surgeon. At least ten doctors saw Gibbs, and not one ordered a spinal tap. (On the morning of May 25, one doctor questioned whether a spinal tap should have been done then, but since his condition was improving, she deferred to the neurologist.) *Page 5 
 IV. Trial {¶ 17} Mrs. Gibbs and Gibbs's estate sued Drs. Donnelly, Bort, McCarren, and Zadikoff, alleging that they should have administered the spinal tap earlier and that the delay in diagnosis was the proximate cause of Gibbs's death.
 {¶ 18} At trial, the defendant doctors and experts for both sides testified that cryptococcal meningitis is extremely rare — only one in a million people with normal immune systems ever get it. (This disease is more common in AIDS patients.) And both sides agreed that a headache is a common symptom of a multitude of diseases.
 {¶ 19} There was conflicting testimony about when a spinal tap should be administered. Mrs. Gibbs's experts asserted that a spinal tap should have been administered during Gibbs's first admission. Defense experts testified that spinal taps are not common diagnostic tools and should not be administered unless there is evidence of an infection other than a severe headache, such as fever or a stiff neck.
 {¶ 20} On causation, Mrs. Gibbs argued that earlier diagnosis would have prevented the death. The defense countered that even if the doctors had administered the test earlier, the outcome would have been the same — Gibbs would not have responded to treatment in any event.
 {¶ 21} Finally, defense experts testified that fever and a stiff neck are the two symptoms that most strongly signal cryptococcal meningitis, that the symptoms are nonspecific, and that the symptoms come and go. Thus the disease is extremely difficult to diagnose. The time it takes to diagnose the disease varied by expert, but it appears to take on average from several weeks to months to diagnose. Gibbs was diagnosed with cryptococcal meningitis on May 28 — 16 days after he had first arrived at the emergency room. *Page 6 
 {¶ 22} The jury rendered a unanimous verdict for all the defendants.
 V. Assignments of Error {¶ 23} Mrs. Gibbs asserts two assignments of error, alleging that the trial court erred by: (1) refusing to allow the cross-examination of a defense expert with a learned treatise that the expert had edited in part and testified was authoritative in some contexts; and (2) failing to excuse three jurors for cause.
 VI. Learned Treatise {¶ 24} Dr. Jeffrey Susman, a medical doctor who was board-certified in family practice, testified that Drs. Bort and Donnelly had not deviated from the standard of care in their treatment of Gibbs. Mrs. Gibbs attempted to impeach Susman's testimony by using the book titledStudent Guide to Primary Care: Making the Most of Your Early ClinicalExperience. Susman was one of three people listed on the cover of the book. Mrs. Gibbs sought to question Susman on a chapter titled "Headache." The court refused to allow Mrs. Gibbs to impeach Susman with this book.
 {¶ 25} Amid much wavering, Susman testified that the book was a reliable source — at least for medical students starting their clinical practices. Although his name was one of three listed on the cover of the book, he stated that he did not review, edit, write, or read the "Headache" chapter of the book.
 {¶ 26} The exclusion or admission of evidence generally rests with the trial court's discretion.[1] A reviewing court should not overturn an evidentiary ruling of a trial court absent an abuse of discretion that has materially prejudiced a party.[2] *Page 7 
 {¶ 27} In Freshwater v. Scheidt, the Ohio Supreme Court held that an expert may be impeached with a learned treatise if the expert relies on that treatise for an opinion, the expert states either implicitly or explicitly that the treatise is a reliable authority, or the treatise is part of the expert's own publication.[3] This is an "or" not an "and" standard — any one of the three is sufficient for impeachment.
 {¶ 28} The book as a whole was Susman's publication. It had his name on the cover. Mrs. Gibbs only attempted to impeach Susman on one chapter, which he said he had not written, read, edited, or reviewed. But as an editor of the publication, Susman should have ensured that the entire book, not just the part he had written, was reliable. For an editor to disavow a book he has put his name on is specious. UnderFreshwater, this book was "part of the expert's own publication," and the trial court should have admitted it.
 {¶ 29} Further, Susman acknowledged that his book was authoritative. An expert does not need to use any specific word to acknowledge a treatise's authoritative nature.[4] Susman conceded that his book was a "reliable source" for those just starting their clinical practice. If this book provided the standard of care for early practitioners regarding the administration of spinal taps, why wouldn't the same standard of care have applied to more seasoned doctors? The standard of care does not vary by the number of years a doctor has been practicing-it is the same for doctors seeing their first patient and for doctors retiring after 30 years of practice.
 {¶ 30} The court should have allowed Mrs. Gibbs to impeach Susman with this book. But Mrs. Gibbs suffered no material prejudice from the error. The outcome of the trial would not have changed had the impeachment gone forward. *Page 8 
 {¶ 31} First, four experts, the four defendants, and another physician who had treated Gibbs all testified for the defense. Susman's testimony was merely cumulative. Following over two weeks of testimony, the jury rendered a unanimous verdict for the defense, after less than a half day of deliberations. The jury obviously believed the defense, and the impeachment of one witness would not have swayed the jury.
 {¶ 32} Second, Susman only testified that the family doctors, Donnelly and Bort, had not been negligent. Susman only made one reference to Zadikoff's performance in his 143 pages of testimony — his testimony did nothing to bolster Zadikoff. Mrs. Gibbs's attorneys, at least twice during closing arguments and several times during trial, referred to Zadikoff as the "expert," implying that he, above all others, should have recognized these vague symptoms as a possible infection and ordered a spinal tap. If the "expert" was not negligent, would any reasonable jury have believed that the family doctors were negligent? We think not.
 {¶ 33} We overrule Mrs. Gibbs's first assignment of error.
 VII. Voir Dire: Dismissal of Jurors for Cause {¶ 34} Mrs. Gibbs asserts that the trial court erred by not excusing prospective jurors Ream, Luckey, and Findley for cause.
 {¶ 35} Prospective juror Shannon Ream revealed in voir dire that he was being sued in a wrongful-death case that he considered frivolous. He stated that there were many frivolous suits, that many people were money-hungry, and that, in his own wrongful-death case, it seemed that the parents were "putting a price on their child's head." Ream admitted that the defendants "may have [had] a bit of a headstart," and that it was "possible" he could not be impartial. But when *Page 9 
questioned further, Ream stated he could separate his own legal experiences from those of Mrs. Gibbs and could "definitely" be fair.
 {¶ 36} The trial court believed that Ream was not biased. An appeals court should not overturn the trial court's ruling unless it was so arbitrary that it was an abuse of discretion.[5] The trial court was in the best position to witness Ream's sincerity, and we perceive no abuse of discretion. We also note that Ream was originally a part of the jury, but was later excused for personal reasons before deliberations.
 {¶ 37} Prospective juror Mary Luckey's daughter was a patient at the defendant family doctors' practice. Luckey knew Dr. Heile, a doctor in the defendant family practice group. (Heile had treated Gibbs, but was not part of the suit.) Luckey had been employed for ten years by a group of doctors not involved in this case who had made referrals to Zadikoff.
 {¶ 38} When asked whether she would have difficulty rendering a verdict for the plaintiffs if she were 51% sure the plaintiffs had proved their case, Luckey indicated that it would have to be a "strong" 51%. She said that damages in excess of $1 million were high, and that a price could not be put on pain and suffering. Luckey later stated she could follow the law, and that her experiences would not affect her ability to be fair.
 {¶ 39} Mrs. Gibbs moved that Luckey be excused for cause, and the court denied her motion. Mrs. Gibbs used a peremptory challenge on Luckey; thus, Luckey did not have a role in the deliberations or the verdict. The court's refusal to excuse Luckey for cause may have been prejudicial error — even though Luckey was excused by a *Page 10 
peremptory challenge — if the court had erroneously denied Mrs. Gibbs's challenge for cause.[6] But the court's decision to deny Mrs. Gibbs's challenge was not erroneous.
 {¶ 40} A trial court has the opportunity to observe potential jurors and to assess their sincerity during voir dire. Therefore, the decision to excuse a juror for cause rests with the trial court's discretion.[7] We will not overturn a trial court's ruling on a challenge for cause unless it was an abuse of discretion.[8]
 {¶ 41} Although Luckey wavered in her answers originally, she ultimately affirmed that she could be fair. The trial court believed Luckey when she said that she could be fair. We perceive no abuse of discretion.
 {¶ 42} Prospective juror Findley was a certified nursing assistant. Her personal physician worked with the defendant family doctors' practice group, but at a different location.
 {¶ 43} When first questioned, Findley indicated that because doctors were only human and made mistakes, a plaintiff would have to prove to a certainty that there was negligence. She also told the defense several times that she could be fair. Her contradictory answers led the trial court to question her further about whether she could follow the law. Findley answered that she could be fair.
 {¶ 44} At that point, Mrs. Gibbs had already used all her peremptory challenges; Findley became a part of the jury that rendered a verdict for the defendants. Findley gave contradictory answers during voir dire. But it was for the trial court to decide which answers were sincere.[9] The court determined that Findley *Page 11 
had been sincere when she said that she would be fair. We perceive no abuse of discretion and overrule Mrs. Gibbs's second assignment of error.
 {¶ 45} For the foregoing reasons, we conclude that the trial court committed no reversible error, and we therefore affirm the judgment entered for the defendants.
Judgment affirmed.
HILDEBRANDT and SUNDERMAN, JJ., concur.
[1] State v. Haines, 112 Ohio St.3d 393, 2006-Ohio-6711,860 N.E.2d 91, at ¶ 50.
[2] State v. Conway, 109 Ohio St.3d 412, 2006-Ohio-2815,848 N.E.2d 810, at ¶ 62.
[3] Freshwater v. Scheidt (1999), 86 Ohio St.3d 260, 269,714 N.E.2d 891.
[4] Id.
[5] State v. Roberts, 110 Ohio St.3d 71, 2006-Ohio-3665,850 N.E.2d 1168, at ¶ 106.
[6] See State v. Cornwell (1999), 86 Ohio St.3d 560, 564,715 N.E.2d 1144; McGarry v. Horlacher, 149 Ohio App.3d 33, 2002-Ohio-3161,775 N.E.2d 865, at ¶ 24.
[7] Berk v. Matthews (1990), 53 Ohio St.3d 161, 168,559 N.E.2d 1301.
[8] State v. Roberts, supra, at ¶ 106.
[9] State v. Group, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, at ¶ 66. *Page 1