[Cite as *State v. D'Agostino*, 2014-Ohio-551.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No.   12CA010304 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| TINA D'AGOSTINO | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No.   10CR080181 |

DECISION AND JOURNAL ENTRY

Dated: February 18, 2014

WHITMORE, Judge.

{¶1}   Defendant-Appellant, Tina D'Agostino, appeals from her convictions in the Lorain County Court of Common Pleas.  This Court affirms in part and reverses in part.

I

{¶2}   On the morning of February 27, 2010, D'Agostino and her live-in boyfriend, Steven Augustus, had a heated argument.  D'Agostino ultimately retreated to their master bedroom and locked herself in while Augustus was taking a shower.  The situation escalated when Augustus tried to gain entry into the bedroom and D'Agostino refused to let him in. Augustus then retrieved several tools from the garage and used the tools to open the bedroom door.  When Augustus opened the door, D'Agostino shot him.  She then took Augustus' truck and drove off while Augustus stumbled to a neighbor's house for help.

{¶3}   A grand jury indicted D'Agostino on each of the following counts: (1) felonious assault, in violation of R.C. 2903.11(A)(2), and an attendant firearm specification; (2) theft, in

violation of R.C. 2913.02(A)(1); and (3) domestic violence, in violation of R.C. 2919.25(A). Subsequently, the matter proceeded to a jury trial. At trial, D'Agostino presented expert testimony on battered woman's syndrome, and the State presented expert testimony on rebuttal. The jury found D'Agostino not guilty of theft, but guilty of the lesser included offense of unauthorized use of a motor vehicle, in violation of R.C. 2913.03(A). Additionally, the jury found her guilty of felonious assault, that charge's attendant firearm specification, and domestic violence. The trial court sentenced D'Agostino on all counts for a total of eight years in prison.

**{¶4}** D'Agostino now appeals and raises four assignments of error for our review.

II

Assignment of Error Number One

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUION (sic) AND ARTICLE I, SECTION 10, OF THE OHIO CONSTITUTION.

**{¶5}** In her first assignment of error, D'Agostino argues that she received ineffective assistance of counsel. Specifically, she argues that (1) due to a medical condition, her appointed counsel was unfit to represent her; and (2) her counsel should have objected to the testimony of the State's expert, Dr. Bob Stinson, and should not have stipulated to the admissibility of his expert report.

**{¶6}** To prove an ineffective assistance claim, D'Agostino must show two things: (1) that counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, D'Agostino must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v.*

*Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland* at 691. Furthermore, this Court need not address both *Strickland* prongs if an appellant fails to prove either one. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

{¶7} D'Agostino first argues that her appointed counsel "did not function as counsel through a significant portion of the case" due to medical complications she experienced after child birth. D'Agostino avers that her counsel notified the jury she was on medication and had an associate handle a "significant portion of the trial." According to D'Agostino, the court should have held a hearing to determine "whether appointed counsel had sufficiently recovered from her medical condition to effectively represent [D'Agostino]."

{¶8} D'Agostino's trial was originally scheduled to begin in April 2012, but her appointed counsel received a continuance. In her memorandum in support of her motion to continue, counsel wrote that she had given birth to her child at the end of February 2012 and was still recovering from "a difficult surgical delivery." The rescheduled trial did not go forward until October 2012. Appointed counsel did not raise any issues with her health at that time. While she told the jury during voir dire that she was "on a medication that ma[de] [her] hands shake," there was no indication that the medication related to her post-child birth complications. Counsel raised the medication issue with the jurors to explain why her hands were shaking and to ask them to ignore the problem if they noticed it.

{¶9} The record reflects that an associate of appointed counsel handled either the direct or cross-examination of multiple witnesses, but that most of those witnesses were called to provide background information on D'Agostino, Augustus, and their relationship with one

another. Appointed counsel conducted voir dire and gave both the opening statement and closing argument. She also cross-examined Augustus, conducted the direct examination of D'Agostino, and both examined and cross-examined the experts who testified. The record does not bare out D'Agostino's assertion that appointed counsel failed to handle the majority of the trial herself. Because there is no evidence that D'Agostino's appointed counsel was suffering from a medical condition that affected her ability to represent D'Agostino, we reject D'Agostino's first ineffective assistance of counsel argument.

{¶10} Next, D'Agostino argues that she received ineffective assistance of counsel because her counsel failed to object to the testimony of Dr. Stinson and stipulated to the admissibility of his expert report. The State called Dr. Stinson on rebuttal after D'Agostino presented expert testimony in her case-in-chief on battered woman's syndrome. D'Agostino argues that her counsel was ineffective for not objecting to Dr. Stinson's testimony because he: (1) encroached upon the trial court's role by giving testimony related to the reliability of her expert, Dr. James Eisenberg's, testimony; and (2) offered highly improper credibility determinations about her and the events as she related them.

{¶11} In *State v. Koss*, 49 Ohio St.3d 213 (1990), the Ohio Supreme Court first recognized battered woman's syndrome as a defense. The Court held that expert testimony on the syndrome was admissible "to assist the trier of fact to determine whether the defendant acted out of an honest belief that she [was] in imminent danger of death or great bodily harm and that the use of such force was her only means of escape." *Koss* at paragraph three of the syllabus. The Court later cautioned, however, that "any battered-woman-syndrome testimony must be admitted in conformance with the Ohio Rules of Evidence." *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, ¶ 42. In *Haines*, the Court held that

> the party seeking to introduce battered woman syndrome evidence must lay an appropriate foundation substantiating that the conduct and behavior of the witness is consistent with the generally recognized symptoms of the battered woman syndrome, and that the witness has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior.

(Quotations omitted.) *Id.* at ¶ 47. Once the proper foundation has been laid, an expert may testify regarding "the general characteristics of a victim suffering from the battered woman syndrome" and may respond to "hypothetical questions regarding specific abnormal behaviors exhibited by women suffering from the syndrome." *Id.* at ¶ 56. The expert "should never offer an opinion relative to the alleged victim in the case." *Id.* That is, the expert should never opine that the victim is, in fact, a battered woman, testify that her significant other is a batterer, or comment on whether the victim is being truthful. *Id.*

{¶12} The first expert witness to testify at trial was Dr. James Eisenberg, an expert called by the defense in its case-in-chief. Dr. Eisenberg testified that he evaluated D'Agostino for battered woman's syndrome at the request of the defense. Dr. Eisenberg explained his methodology and set out the criteria he used to conduct his evaluation. He discussed the Minnesota Multiphasic Personality Inventory, Second Edition, test that he performed on D'Agostino in detail, including the results of the test. During his testimony, Dr. Eisenberg testified that:

- D'Agostino had "suffered abuse from * * * Augustus";

- D'Agostino was a battered woman;

- he "believe[d] [D'Agostino] was in a situation where she believed that she was in danger of imminent harm and acted accordingly";

- it "seem[ed] to [him]" the victim was "an abusive kind of guy";

- he thought the victim's behavior was "pretty outrageous"; and

- he "ultimately[] believe[d] that [D'Agostino] told [him] an accurate account of the abuse that she was experiencing."

Dr. Eisenberg also agreed that he would not have found D'Agostino to be a battered woman if he thought she had fabricated her story.

{¶13} Defense counsel specifically asked Dr. Eisenberg on direct examination if he had reviewed the report of the State's expert, Dr. Stinson. Dr. Eisenberg indicated that he had, but that he had "discount[ed] it as not relevant" because Dr. Stinson had not personally interviewed D'Agostino. Only after Dr. Eisenberg's testimony did the State call its expert, Dr. Stinson, on rebuttal.

{¶14} Dr. Stinson testified that he was asked to review Dr. Eisenberg's methodology and determine whether he could have reached "valid and reliable conclusions and opinions." Dr. Stinson went on to testify that Dr. Eisenberg's methodology was flawed and that he had gathered insufficient information to support the conclusions that he had drawn. He specified that Dr. Eisenberg should not have assumed D'Agostino was being truthful and noted that there were inconsistencies in her statement. Dr. Stinson opined that, had the proper methodology been used, he was confident Dr. Eisenberg would have reached a different conclusion. On cross-examination, defense counsel specifically asked Dr. Stinson whether he had an opinion on whether D'Agostino suffered from battered woman's syndrome. Dr. Stinson then replied that there was no evidence that D'Agostino suffered from the syndrome.

{¶15} Having reviewed the record, we must conclude that D'Agostino cannot demonstrate prejudice as a result of her counsel's failure to object to Dr. Stinson's testimony. Dr. Stinson did not testify until after D'Agostino's expert, Dr. Eisenberg. In contravention of *State v. Haines*, Dr. Eisenberg testified extensively regarding D'Agostino's credibility, his belief

that Augustus was a batterer, and his opinion that D'Agostino was a battered woman. *See Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, at ¶ 56. He also testified extensively about the methodology he used to evaluate D'Agostino and the results of the tests he performed on her. Seeking to rebut Dr. Eisenberg's testimony, the State then called Dr. Stinson to criticize Dr. Eisenberg's conclusions and methodologies and to point out inconsistencies in D'Agostino's statements.

{¶16} D'Agostino has not argued that her counsel was ineffective for introducing the theory of battered woman's syndrome or for calling Dr. Eisenberg as an expert witness. Instead, she argues that her counsel was ineffective for not objecting when Dr. Stinson doubted her version of the events and suggested that her statements were inconsistent. Had D'Agostino's counsel objected to Dr. Stinson's testimony, however, the invited error doctrine would have applied. *See State v. Campbell*, 90 Ohio St.3d 320, 324 (2000), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus ("The doctrine of invited error holds that a litigant may not 'take advantage of an error which he himself invited or induced.'") By having her own expert testify extensively about his methodologies and her credibility, D'Agostino opened the door for the State to rebut that testimony through Dr. Stinson. As such, D'Agostino cannot demonstrate prejudice as a result of her counsel's failure to object to Dr. Stinson's testimony.

{¶17} D'Agostino also argues that her counsel was ineffective for stipulating to Dr. Stinson's expert report. Once again, however, D'Agostino cannot demonstrate prejudice as a result of her counsel's decision to stipulate to Dr. Stinson's report. Both Dr. Eisenberg's and Dr. Stinson's reports mirrored the testimony that they gave at trial. The State only called Dr. Stinson and introduced his report after D'Agostino called Dr. Eisenberg and introduced his report in her

case-in-chief. As noted above, D'Agostino has not argued that her counsel was ineffective for introducing the theory of battered woman's syndrome or for calling Dr. Eisenberg as an expert witness. D'Agostino has not shown that, had her counsel not stipulated to Dr. Stinson's report, the result of her trial would have been different. *See Bradley*, 42 Ohio St.3d at paragraph three of the syllabus. D'Agostino's first assignment of error is overruled.

Assignment of Error Number Two

THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT WHEN, OVER THE OBJECTION OF APPELLANT, IT INCLUDED JURY INSTRUCTIONS ON THE DUTY TO RETREAT, WHERE THE CIRCUMSTANCES GIVING RISE TO THE CLAIM OF SELF-DEFENSE OCCURRED IN APPELLANT'S HOME.

{¶18} In her second assignment of error, D'Agostino argues that the trial court erred in its self-defense instructions to the jury.

{¶19} Generally, a defendant's failure to object to an allegedly erroneous jury instruction limits any review of the alleged error to a review for plain error. *State v. Johnson*, 9th Dist. Summit No. 25525, 2011-Ohio-3941, ¶ 20. D'Agostino claims that she preserved an objection to the court's self-defense instructions because she objected when the court agreed to issue a flight instruction to the jury. According to D'Agostino, "[f]rom the context of the dialogue before the Trial Court, it is clear defense counsel was objecting to the inclusion of the duty to retreat instruction." The record, however, does not support D'Agostino's claim that she preserved an objection to the court's self-defense instructions.

{¶20} At the close of the evidence, the court gave both parties copies of the jury instructions it intended to issue. The prosecutor then indicated that she wanted "to renew [her] oral motion for a flight instruction." The court said that it would allow the parties to review the

instructions and return to the courtroom at a later time to raise any issues they had with the instructions. When the parties later returned, the following brief exchange occurred:

> THE COURT: Very well. With regards to the Jury instructions, anything else from the State of Ohio?
>
> [THE PROSECUTOR]: No, Your Honor.
>
> THE COURT: [Defense counsel], anything from the defense?
>
> [DEFENSE COUNSEL]: I would object to the flight instruction, your Honor.
>
> THE COURT: Very well. Noted and overruled. Thank you.

No further discussion about the jury instructions took place. Moreover, the record reflects that defense counsel did not object to any of the self-defense instructions when the court read them to the jury.

{¶21} The only instruction to which defense counsel objected was the flight instruction. That instruction related to D'Agostino's leaving the scene after she shot Augustus and was wholly separate from the instructions on self-defense and the duty to retreat. Nothing in the record supports D'Agostino's claim that she objected to the self-defense instructions. Because she never objected to the court's self-defense instructions, she forfeited any challenge to them for purposes of her appeal. *See State v. Feliciano*, 9th Dist. Lorain No. 09CA009595, 2010-Ohio-2809, ¶ 8. Consequently, we limit our review to a review for plain error. *Id.*

{¶22} Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. "[T]he decision of a trial court will not be reversed due to plain error unless the defendant has established that the outcome of the trial clearly would have been

different but for the alleged error." *State v. Horton*, 9th Dist. Summit No. 26407, 2013-Ohio-3902, ¶ 50.

{¶23} To establish self-defense in circumstances involving the application of deadly force, a defendant must prove that he: "(1) * * * was not at fault in creating the situation giving rise to the affray; (2) * * * ha[d] a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) * * * [did] not [] violate[] any duty to retreat or avoid the danger." *State v. Westfall*, 9th Dist. Lorain No. 10CA009825, 2011-Ohio-5011, ¶ 19, quoting *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 4. Yet, "[t]here is no duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home." *State v. Thomas*, 77 Ohio St.3d 323 (1997), syllabus. *Accord* R.C. 2901.09(B). "[A] person who, through no fault of her own, is assaulted in her home may stand her ground, meet force with force, and if necessary, kill her assailant, without any duty to retreat." *Thomas* at 327.

{¶24} The trial court instructed the jury that, as one element of self-defense, D'Agostino had to prove that she "had not violated any duty to retreat or avoid the danger." The court also instructed the jury that D'Agostino

> had a duty to retreat if she was at fault in creating the situation giving rise to the altercation, or did [not] have reasonable grounds to believe and an honest belief that she was in imminent danger of death or great bodily harm, or that she had reasonable means of escape from that danger other than by the use of deadly force.

Conversely, the court instructed that D'Agostino did not have a duty to retreat

> if she withdrew from the situation, and she had reasonable grounds to believe and an honest belief that she was in imminent danger of death or great bodily harm, and that the only reasonable means of escape from that danger was by the use of deadly force, even [though] she was mistaken as to the existence of that danger.

It further instructed that

> [i]f [D'Agostino] was assaulted in her own home, [she] had no duty to retreat and could use such means as were necessary to repel the assailant from the home, even deadly force, provided that she had reasonable grounds to believe and an honest belief that the use of deadly force was necessary to repel the assailant.

The court finished the self-defense instruction by stating that "[t]here is no duty to retreat from one's own home before resorting to [] lethal force in self-defense against a co-habitant with an equal right to be in the home."

{¶25} D'Agostino argues that the court erred when it instructed the jury on the duty to retreat because she did not have a duty to retreat from her own home. She avers that the court's instructions confused the jury. She further avers that the confusion was not remedied by the court's final instructions because the court instructed that she did not have a duty to retreat if she "was assaulted in her own home." According to D'Agostino, the castle doctrine, as it is codified in R.C. 2901.09(B), does not contain any requirement that a person actually be assaulted before resorting to force in the person's own home.

{¶26} This Court considered a plain error challenge to the same jury instructions that the trial court issued here in *State v. Geter-Gray*, 9th Dist. Summit No. 25374, 2011-Ohio-1779, ¶ 15-17. In *Geter-Gray*, we held that the court did not commit plain error by instructing the jury on the duty to retreat because "it also told the jury that, '[i]f [Ms. Geter-Gray] was assaulted in her own home, [she] had no duty to retreat or escape and could use such means as are necessary to repel the assailant from the home * * *.'" *Id.* at ¶ 17. D'Agostino concedes that we previously have rejected the same argument she presents, but argues that her case is distinguishable because here "inclusion of the duty to retreat instruction was objected to at trial." As noted above, however, D'Agostino did not object to the duty to retreat instruction at trial.

{¶27} Consistent with our precedent, we must conclude that D'Agostino has not demonstrated plain error as a result of the court's self-defense instructions. *See id.* at ¶ 15-17. *Accord State v. Flint*, 9th Dist. Summit No. 26308, 2012-Ohio-5268, ¶ 7-9. D'Agostino's second assignment of error is overruled.

Assignment of Error Number Three

THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENTS OF CONVICTION ON THE CHARGES OF FELONIOUS ASSAULT AND DOMESTIC VIOLENCE, WHERE THE JUDGMENTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶28} In her third assignment of error, D'Agostino argues that her convictions for felonious assault and domestic violence are against the manifest weight of the evidence. Specifically, she argues that the evidence establishes that she acted in self-defense. We disagree.

{¶29} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against

the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

**{¶30}** R.C. 2903.11(A)(2) prohibits any person from knowingly "caus[ing] or attempt[ting] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." Whoever violates R.C. 2903.11(A)(2) is guilty of felonious assault. R.C. 2903.11(D)(1)(a).

**{¶31}** R.C. 2919.25(A) prohibits any person from "knowingly caus[ing] or attempt[ting] to cause physical harm to a family or household member." Whoever violates R.C. 2919.25(A) is guilty of domestic violence. R.C. 2919.25(D)(1).

**{¶32}** "A defendant has the burden of establishing the affirmative defense of self-defense by a preponderance of the evidence." *State v. Gates*, 9th Dist. Summit No. 24941, 2010-Ohio-2994, ¶ 7.

> In general, to establish self-defense, including self-defense involving deadly force, the defendant must prove that:
>
> "(1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the defendant must not have violated any duty to retreat or avoid the danger."

*Gates* at ¶ 7, quoting *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 4. As previously noted, however, "[t]here is no duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home." *Thomas*, 77 Ohio St.3d at syllabus.

**{¶33}** Augustus testified that he and D'Agostino met in 2009 and lived together at his condominium before moving into her former marital residence. D'Agostino's former husband quit-claimed the property to Augustus, and Augustus and D'Agostino agreed that she would pay

the utilities while he paid all of the other household expenses. Augustus testified that money quickly became a hot point in the relationship because D'Agostino could not maintain steady employment and the bills piled up. Augustus agreed that the two had shouting matches that often involved name calling and swearing. He also admitted that he had shoved D'Agostino on a few occasions when he had tried to leave the room because she had used her body to block the doorway.

{¶34} Augustus testified that he slept on the couch the night before the incident that occurred here because he wanted to avoid D'Agostino. At some point in the morning, D'Agostino complained to Augustus that she was cold. Augustus then gathered several photographs of them as a couple and gave the pictures to D'Agostino, who was near their wood burning stove. He admitted that, when he did so, he told her "to keep warm with that, you f***ing bitch." Subsequently, Augustus left the room and took a shower.

{¶35} Augustus described the master bathroom in the house as having two doors; one door that led directly into the master bedroom and one door that opened out into the hallway. He further described the master bedroom as having two doors; one door that led into the master bathroom and one door that opened out into the hallway. When he finished his shower, Augustus wrapped a towel around himself and tried to open the door leading into the bedroom. Augustus testified that the door was locked, so he walked out into the hallway and tried to open the other door to the bedroom. That door was also locked. Realizing that D'Agostino had locked herself in the bedroom, Augustus called out to her several times. According to Augustus, he told D'Agostino to open the door so that he could get his clothes and leave. Augustus admitted that he became increasingly angry the more he told D'Agostino to unlock the door and

that he eventually resorted to screaming at her. According to Augustus, D'Agostino never said anything the entire time he tried to gain entry to the bedroom.

{¶36} After Augustus screamed at D'Agostino to open the door, he walked out to the garage and retrieved a hammer and punch. He then knelt in the hallway outside the bedroom door and used the tools to open the lock. Augustus testified that as soon as he opened the door to the bedroom, and while he was still kneeling, D'Agostino shot him. Augustus stated that D'Agostino never warned him that she was holding a gun or that she was going to shoot him if he came into the bedroom. He further stated that D'Agostino ignored his pleas for her to call 911 after she shot him. Augustus then put on some clothes and stumbled down the street to a neighbor's house for help.

{¶37} Officer Shawn Corr testified that he briefly spoke with Augustus at the house while the paramedics were treating him and interviewed him again at the hospital. Officer Corr testified that Augustus' first statement was consistent with his second statement. In both statements, Augustus stated that he and D'Agostino had engaged in a verbal disagreement before he took a shower and that she had locked him out of the bedroom. Augustus further stated that he had removed the handle to the bedroom door with several tools he had taken from the garage and that, when he had opened the door, D'Agostino had shot him.

{¶38} Trooper Joshua Bolduan testified that he stopped D'Agostino on an active warrant later that same day as she was driving Augustus' truck. Trooper Bolduan Mirandized D'Agostino, placed her in the back of his cruiser, and drove her back to the Sheffield Police Department. As they drove, D'Agostino stated that she had "snapped and shot [Augustus]" because he had been "very emotionally abusive towards her throughout that day." D'Agostino also stated that Augustus had a drinking problem and that she was worried he was going to sell

the house and "she wouldn't get a dime." Trooper Bolduan testified that D'Agostino only mentioned one instance where Augustus had been physically abusive, but noted that it had occurred when he kicked D'Agostino in his sleep after he had been drinking.

{¶39} D'Agostino testified that she and Augustus had an abusive relationship in which he exercised control over her. She stated that she could never be herself around Augustus and that his moods were volatile, such that "[a]ny little thing would set him off." D'Agostino described several prior instances where she claimed Augustus had physically abused her. She described one instance where Augustus had held her over the balcony at his condominium and choked her while he "was beating the living crap out of [her]." According to D'Agostino, she was screaming while Augustus attacked her. She acknowledged, however, that none of the neighbors at the condominium ever called the police, despite the fact that the neighbors both above and below Augustus also had balconies.

{¶40} D'Agostino averred that Augustus frequently punched and kicked her, but never hit her in the face. She testified that Augustus "loved body shots," and had hit her so hard that she thought he had broken her ribs. D'Agostino testified that she only told Augustus' friends and his children about the abuse because she was too ashamed to tell her own family. She admitted, however, that none of the people who she claimed to have told about the abuse would corroborate her claims of abuse. For example, Barbara Stiles, a friend and neighbor of both D'Agostino and Augustus, testified that she never saw D'Agostino display any signs of abuse. Stiles saw D'Agostino frequently, as they sometimes socialized and Stiles paid D'Agostino to clean her house once a week. Stiles described D'Agostino as "very possessive and demanding." She also testified that D'Agostino would tell her when she and Augustus had had an argument. On one particular occasion when D'Agostino was particularly upset, Stiles offered to let

D'Agostino stay at her house. D'Agostino, however, refused and stated that "she knew [Augustus] would never hurt her."

{¶41} D'Agostino testified that, on the morning of the incident here, Augustus began screaming at her and removing all of the cable cords from the televisions throughout the house because she had fallen asleep with one of the televisions on. As the morning progressed, Augustus continued screaming at D'Agostino while he did other things. D'Agostino testified that she sat by the wood burner while Augustus screamed at her and did not respond. As she sat there, and without any prompting, Augustus turned off all the breakers in the house, gathered all the pictures from their frames, lit them on fire, and held them up to her while stating "keep warm with that, you f***ing bitch." Augustus then went to take a shower.

{¶42} D'Agostino stated that she locked herself in the master bedroom when Augustus went to take a shower because she knew he planned to leave the house and she did not want to talk to him anymore. D'Agostino testified that Augustus had more clothing in one of the upstairs bedrooms and, when he first yelled at her to open the door, she told him to just go get clothes from upstairs. According to D'Agostino, she began to get more and more nervous as Augustus banged on the door because he was screaming that he would "fix [her] ass" and was "going to kick [her] mother f***ing ass like [he] never kicked it before." Once she realized Augustus planned to hurt her, D'Agostino testified that she grabbed her gun and retreated to the furthest part of the bedroom. She stated that Augustus had a hammer in his hand when the door open and, believing Augustus would use the hammer on her, she "closed [her] eyes, and [] shot him."

{¶43} D'Agostino admitted that after she shot Augustus, she took his truck and drove to Chicago. She stated that she did not call 911 for Augustus because she did not think he was hurt. She also stated that she tried to find a police station once inside the truck, but that she was unable

to locate one. D'Agostino acknowledged, however, that there was a police station approximately a mile and a half from the house. She further acknowledged that she had her cell phone with her from the moment she left the house and never used it to call the police.

{¶44} As previously noted, the first police officer with whom D'Agostino came into contact was Trooper Bolduan. Although D'Agostino told Trooper Bolduan that Augustus was verbally abusive, a heavy drinker, manic depressive, and wanted to sell the house, she did not tell him about any physical abuse. She also failed to tell him that Augustus was holding a hammer when the door to the bedroom opened. When questioned about why she did not tell Trooper Bolduan about the physical abuse or the hammer, D'Agostino said that she "never told him a lot of stuff." She also stated that she did not remember a lot of her conversation with Trooper Bolduan.

{¶45} Having reviewed the entire record, we cannot conclude that the jury lost its way in convicting D'Agostino of felonious assault and domestic violence. The jury was essentially presented with competing views of the evidence and chose to believe Augustus' version of the events. "This Court has repeatedly recognized that the jury is in the best position to judge the credibility of witnesses * * *." *State v. Ross*, 9th Dist. Lorain No. 09CA009742, 2012-Ohio-536, ¶ 42. "[A] verdict is not against the manifest weight of the evidence where the jury's resolution of credibility is reasonable and where the jury ultimately chose to believe the State's witnesses as opposed to defense witnesses." *State v. Brown*, 9th Dist. Summit No. 26490, 2013-Ohio-5112, ¶ 20. Given all of the evidence before us, we must conclude that this is not the exceptional case where the jury clearly lost its way by convicting D'Agostino of felonious assault and domestic violence. D'Agostino's third assignment of error is overruled.

Assignment of Error Number Four

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT SENTENCED
APPELLANT ON THE CHARGE OF FELONIOUS ASSAULT AND
DOMESTIC VIOLENCE, WHERE THE OFFENSES WERE ALLIED
OFFENSES OF SIMILAR IMPORT.

**{¶46}** In her fourth assignment of error, D'Agostino argues that the trial court erred by sentencing her to allied offenses of similar import. The State concedes the error and asks this Court to remand the matter for the trial court to issue a nunc pro tunc entry. We agree that a remand is appropriate.

**{¶47}** "Clerical mistakes in judgments * * * arising from oversight or omission, may be corrected by the court at any time." Crim.R. 36. The "appropriate remedy" for a clerical mistake is "generally a nunc pro tunc entry." (Internal quotations and citations omitted.) *State v. Battle*, 9th Dist. Summit No. 23404, 2007-Ohio-2475, ¶ 5. "[N]unc pro tunc entries are limited in proper use to reflecting what the court actually decided, not what the court might or should have decided or what the court intended to decide." *State ex rel. Fogle v. Steiner*, 74 Ohio St.3d 158, 164 (1995).

**{¶48}** At the sentencing hearing, the trial court stated that D'Agostino's domestic violence count "would be allied with [her felonious assault count], and merged for purposes of sentencing." The trial court orally imposed a prison term on D'Agostino for her other two counts, but not on the domestic violence count. When the court issued its sentencing entry, however, the court imposed a sentence on all three counts. Because the record reflects that the trial court meant for D'Agostino's felonious assault and domestic violence counts to merge, we agree with the State that the matter must be remanded. "Accordingly, upon remand, the trial court shall enter, nunc pro tunc, an entry reflecting what occurred at the sentencing hearing with

respect to merger." *State v. Roper*, 9th Dist. Summit Nos. 26631 & 26632, 2013-Ohio-2176, ¶ 4. D'Agostino's fourth assignment of error is sustained on that basis.

III

{¶49}  D'Agostino's fourth assignment of error is sustained.  Her remaining assignments of error are overruled.  The judgment of the Lorain County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for the court to issue a nunc pro tunc entry reflecting the merger of D'Agostino's allied offenses.

Judgment affirmed in part,
reversed in part,
and cause remanded.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

BETH WHITMORE
FOR THE COURT

MOORE, P. J.
CONCURS.

HENSAL, J.
CONCURRING IN JUDGMENT ONLY.

{¶50} I agree with the majority's resolution of the second, third, and fourth assignments of error, but write separately to explain why I believe the ineffective assistance of counsel argument Ms. D'Agostino makes regarding the admission of Dr. Stinson's report and testimony is without merit.   As the majority has noted, Ms. D'Agostino must establish that her lawyer's performance was deficient and that the deficient performance prejudiced her defense.

{¶51} According to Ms. D'Agostino, her lawyer should not have stipulated to Dr. Stinson's report and should have objected to his testimony.  She argues that Dr. Stinson's report and testimony "were related to the admissibility of [Dr. Eisenberg's] testimony," which, she contends, is a preliminary question for the trial judge to resolve.  I do not agree that the purpose of Dr. Stinson's report and testimony was to challenge the admissibility of Dr. Eisenberg's testimony.   Rather, Dr. Stinson contested Dr. Eisenberg's credibility by challenging the methodology he used when he analyzed whether Ms. D'Agostino fits within the parameters of a person for whom this defense is available.  Ms. D'Agostino acknowledges that Dr. Stinson did not testify whether she, in fact, suffers from battered spouse syndrome, but merely criticized the thoroughness of Dr. Eisenberg's investigation.  Dr. Stinson's conclusion that Dr. Eisenberg did not collect enough information to diagnose Ms. D'Agostino as a battered woman went to the weight of Dr. Eisenberg's opinion, not its admissibility.

{¶52} Ms. D'Agostino also argues that her lawyer should have objected to Dr. Stinson's report and testimony because they were not admissible under Revised Code Section 2901.06(B)

and Evidence Rule 403. In particular, she argues that Dr. Stinson's report improperly weighed on her credibility. Although Dr. Stinson used the words "questionable," "highly suspect," and "incredulous[ ]" in his report, his statements must be viewed in context. According to Dr. Stinson, the purpose of his investigation was to determine whether Dr. Eisenberg used the correct methodology to analyze Ms. D'Agostino's battered woman claim. Dr. Eisenberg admitted that, as a forensic psychologist, he must "doubt everyone." Dr. Stinson's criticism of Dr. Eisenberg was that he did not question Ms. D'Agostino's account of the facts, even though the information he gathered from her would give an objective analyst reason to doubt her.

{¶53} In his report, Dr. Stinson identified the parts of Ms. D'Agostino's story that would give a forensic psychologist reason to doubt whether she was a battered woman. He noted that Ms. D'Agostino claimed that she drove to Chicago after she shot her boyfriend because she was still in fear of him. She also said, however, that she offered her boyfriend a ride to the hospital after she shot him. Dr. Stinson noted the inherent inconsistency between those statements. He further testified that Ms. D'Agostino stated that she wanted to turn herself in after the shooting, but claimed that she could not find a police officer between Sheffield Lake and Chicago, even though she lives less than half a mile from a police station. He also saw no evidence of learned helplessness, which, he testified, is a hallmark of battered spouse syndrome. He opined that, in light of those issues and others, Dr. Eisenberg needed to collect more information before he could diagnose Ms. D'Agostino as a battered woman. Accordingly, although Dr. Stinson's report contains statements concerning Ms. D'Agostino's credibility, they merely point out the reasons that he believed Dr. Eisenberg needed to do additional investigation before drawing a conclusion. Given the context and Dr. Stinson's explanation at trial that he was not saying that Ms. D'Agostino is not a battered woman, only that Dr. Eisenberg did not collect enough

information to determine that issue, Ms. D'Agostino has not demonstrated that his report and testimony were inadmissible under Section 2901.06 or Evidence Rule 403. She, therefore, has not established ineffective assistance of trial counsel.

APPEARANCES:

MICHAEL J. DUFF, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellee.