[Cite as *State v. Cleavenger*, 2022-Ohio-2942.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

TODD CLEAVENGER

    Appellant

C.A. No.    29519

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 19 01 0041

DECISION AND JOURNAL ENTRY

Dated: August 24, 2022

SUTTON, Judge.

{¶1}    Defendant-Appellant Todd Cleavenger appeals the judgment of the Summit County Court of Common Pleas. For the reasons that follow, this Court affirms.

I.

**Relevant Background Information**

{¶2}    Mr. Cleavenger and B.O. were involved in a romantic relationship for approximately two years. During that time, Mr. Cleavenger and B.O. stopped talking, for a period-of-time, and B.O. changed the locks to her home. Mr. Cleavenger and B.O. subsequently rekindled their relationship and, by New Year's Eve 2018, they considered making it "official." Mr. Cleavenger and B.O. spent time together on New Year's Eve, at the Garage Bar, in Barberton, Ohio.[1] B.O. testified: "[w]e drank, played darts, and then I had one of the other people that were there, the customers, give me a ride to [Fehrs Corner Café] because I had been drinking." B.O.

---

[1] Mr. Cleavenger owned the Garage Bar.

further testified she left the Garage Bar, around 12:30 a.m., because Mr. Cleavenger "was extra friendly with a female there[.]"  Prior to leaving, Mr. Cleavenger retrieved B.O.'s purse from behind the bar, and her coat from the office.  B.O. testified her house keys were either in her purse or coat.

{¶3}    B.O. then "sat [at Fehrs Corner Café], hung out, [and] drank some more until the bar closed," leaving somewhere between 3:00 a.m. and 3:30 a.m.  B.O. further testified she contacted K.T., the father of her children, for a ride home because she had been drinking.  B.O. stated she and K.T. "have a pretty good relationship.  We get along well."  K.T. drove B.O. home, and upon arriving, she realized she did not have her house keys.  B.O. then asked K.T. to help her "break in [her] house" by going around to a back window.  B.O. further stated: "[a]t this time I'm sitting in the car and [K.T.'s] in the back of the house and then shortly after * * * K.T. was coming back around and [Mr. Cleavenger]  was coming out of the front door."  B.O. did not expect Mr. Cleavenger to be inside her home.

{¶4}    Additionally, B.O. testified Mr. Cleavenger came down off the front porch and shoved her in front of K.T.  K.T. and Mr. Cleavenger "exchanged some words," and Mr. Cleavenger acted as if he was going to leave.  After checking with B.O., K.T. left and Mr. Cleavenger started arguing with B.O., calling her a "whore."  Inside the house, Mr. Cleavenger hit and kicked B.O. repeatedly on her body, face, back, arms, and legs.  Mr. Cleavenger momentarily calmed down and instructed B.O. to take off her dress.  B.O. complied and Mr. Cleavenger resumed the attack, starting in the living room and ending in her children's bedroom.[2]  B.O. recalled being hit and kicked as Mr. Cleavenger screamed "[w]hy would you call [K.T.], what is wrong with you?"

---

[2] B.O.'s children were staying at her mother's home that evening.

{¶5} Finally, B.O. got Mr. Cleavenger to stop assaulting her by telling him, "[t]he kids have to see me like this tomorrow." Mr. Cleavenger took the blankets out of the children's room and told B.O. she "was a whore * * * and didn't deserve any blankets or clothes." Mr. Cleavenger also photographed B.O., battered and naked, with the camera on his cellular phone.[3] He then left the room and shut the door. B.O. attempted to go out of the room to get some blankets, but Mr. Cleavenger began yelling again, telling her she "wasn't allowed, that [she] didn't deserve any." B.O. went back into her children's room and waited until she no longer heard Mr. Cleavenger outside the door. B.O. slowly unlocked and lifted the window, wrapped herself in a fitted bed sheet, crawled out the window, and ran to her neighbor's house.

{¶6} B.O. told her neighbor, "[Mr. Cleavenger] just beat the shit out of me." B.O.'s neighbor then called the Barberton police and they arrested Mr. Cleavenger inside B.O.'s house. B.O. was then taken by ambulance to the hospital for treatment.

{¶7} Mr. Cleavenger was indicted on one count of kidnapping, in violation of R.C. 2905.01(A)(3)/R.C. 2905.01(C)(1), a felony of the first degree; one count of felonious assault, in violation of R.C. 2903.11(A)(1)/R.C. 2903.11(D)(1)(a), a felony of the second degree; and one count of abduction, in violation of R.C. 2905.02(A)(2)/R.C. 2905.02(C), a felony of the third degree. Mr. Cleavenger pleaded not guilty to the charges in the indictment. The matter proceeded to jury trial where Mr. Cleavenger was convicted of the charged offenses. After merging the abduction count with the kidnapping count for sentencing purposes, the trial court

---

[3] The photographs taken with the camera on Mr. Cleavenger's cellular phone are part of the record and depict B.O. as described above.

imposed an 11-year prison term on the count of kidnapping and a five-year prison term on the count of felonious assault. The trial court further ordered the sentences for kidnapping and felonious assault to be served consecutively for an aggregate prison-term of 16 years.

{¶8} Mr. Cleavenger now appeals, raising five assignments of error for this Court's review. To better facilitate our analysis, we combine and reorder certain assignments of error below.

II.

**ASSIGNMENT OF ERROR I**

**THE TRIAL COURT ERRED WHEN IT PERMITTED NURSE AMANDA SHIELDS TO TESTIFY AS AN EXPERT WITNESS WITHOUT HAVING CREATED AN EXPERT REPORT THAT WAS SUPPLIED TO THE DEFENSE.**

{¶9} In his first assignment of error, Mr. Cleavenger argues the trial court erred in allowing Amanda Shields, a Sexual Assault Nurse Examiner ("SANE nurse"), to testify as an expert witness without the prior submission of an expert report pursuant to Crim.R. 16(K). Specifically, Mr. Cleavenger challenges Ms. Shields' testimony regarding her "specialized training as it relate[s] to the memory of abuse victims." However, because Ms. Shields testified as a lay witness, not an expert witness, Mr. Cleavenger's argument is misplaced.

{¶10} The Eighth District Court of Appeals, in *State v. Belle*, 8th Dist. Cuyahoga Nos. 107046, 107300, 2019-Ohio-787, addressed a similar issue as the one before this Court. Mr. Belle, convicted of rape and kidnapping with a violent predator specification, argued "the trial court improperly admitted a SANE [] nurse's testimony regarding trauma and memory," without first qualifying her, pursuant to Evid.R. 702, as an expert witness. *Id.* at ¶ 1, 39. In *Belle*, B.W., the victim, testified:

she was addicted to crack cocaine. On July 4, 2012, she had four or five dollars with her and was looking to buy drugs. She came upon [Mr.] Belle, someone she had smoked crack with in the past. He offered to help her buy drugs. As they walked up the steps of an abandoned building, he pushed her down and raped her, without using a condom. She asked him to stop, but he told her to shut up. He also hit her face several times. Her earrings came off during the attack and a lipstick also fell out of her pocket. Afterward, he grabbed her money and left.

*Id.* at ¶ 5. Further:

*B.W. did not remember exactly what happened after the incident, but she recalled being at the hospital for a rape kit to be collected. She also vaguely remembered going back to the scene of the incident with a police officer and found her earrings and lipstick.* B.W. identified [Mr.] Belle in the courtroom as her assailant.

(Emphasis added.) *Id*. at ¶6. The SANE nurse, in *Belle*, then testified regarding treating B.W. and administering the rape kit. Further, the SANE nurse testified "extensively about the training she received to be a forensic nurse for victims of sexual assault, including the neurobiology of trauma and its effect on memory." *Id*. at ¶ 7. Mr. Belle argued the SANE nurse's testimony, "regarding the effect of trauma on the memory of a sexual assault victim," was improper "expert" testimony. *Id*. at ¶ 39. In finding no error in the trial court's admission of the SANE nurse's testimony, the *Belle* court reasoned:

[The SANE nurse] was asked, based on her experience with sexual assault patients, whether [victims] always remembered the sexual acts. The [S]tate had laid a foundation demonstrating that [the SANE nurse] had a sufficient amount of experience and training and her testimony here was based on her personal knowledge and experience. * * * As such, [the SANE nurse's] testimony fell within the ambit of Evid.R. 701's requirement that the lay opinion be rationally based on firsthand observations and helpful in determining a fact in issue.

*Id*. at ¶ 48.

{¶11} Here, the State called Ms. Shields as a witness and went through her experience and training as a registered nurse. Ms. Shields explained she works in the Emergency Department at Summa Barberton Hospital, and for the forensic program for Cleveland Clinic Akron General. Ms. Shields also explained she has a Bachelor of Nursing degree from Kent State University, has

several certifications, including the Trauma Nurse Core Curriculum and SANE training. Ms. Shields indicated the SANE training teaches nurses "how to care for victims of abuse." Further, Ms. Shields explained the SANE training teaches nurses "how to recognize visible and non-visible injuries, and * * * the * * * mental and physical aspects of victimizations." The State then asked Ms. Shields if, as part of her training, she understands "how time affects a victim[.]"

{¶12} Mr. Cleavenger objected to this line of questioning and a sidebar discussion was held outside the presence of the jury. Mr. Cleavenger's counsel indicated, "[s]o, it's my understanding this is a fact witness. It sounds like she's going to go into expert testimony. * * * I just got her CV; * * * there's been no report about what her opinions would be." The State responded: "[s]he's not an expert. She is the treating nurse. She is SANE certified. Her testimony will be this is what my training is, this is the report that [B.O.] gave me." The State also indicated: "I'm going to particularly ask her * * * when a victim comes into the hospital, do they give you all the information at the same time; is it in an orderly fashion; when you took [B.O.'s] information, when you consider your training, what information did [B. O.] give you." Mr. Cleavenger's counsel further stated:

* * *

I agree she could testify as to what she was told.

The issue that I have with it is the question that was just asked; and the answer that started to come out * * * [she] was opining on things that she's learned in her training.

* * *

Additionally, the State clarified: "[s]he's not examining anyone blindly, like an expert would. She's not going to offer a specific diagnosis[.] [H]er training needs to be explained and how she took that report." Mr. Cleavenger's counsel stated for the record his continuing objection.

{¶13} In allowing Ms. Shields' testimony, the trial court reasoned, "SANE nurses question victims in a certain way for a certain reason and she's allowed to explain that and all that kind of stuff." Mr. Cleavenger's counsel responded, "[y]eah, I don't have an issue with that, Your Honor." Ms. Shields commenced testifying as follows:

* * *

[Ms. Shields]: So, it's not always a linear area timeline when a patient is victimized and when a patient is traumatized physically and emotionally and mentally; flashbacks will come back later when a patient will remember more details as time goes on.

[The State]: And does that affect how you question patients?

[Ms. Shields]: Yes. Basically when I talk to them I just try and get a picture of what it is that happened.

* * *

When I treated B.O., I asked her the questions of what happened; what brought you here; where [do] you hurt; document injuries, and at that point that was my role with her.

[The State]: Is there any way to predict what would be remembered at what particular time?

[Ms. Shields]: No. It's very subjective to each traumatization.

* * *

{¶14} Indeed, pursuant to Evid.R. 701, "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Similar to *Belle*, the State, here, laid the proper foundation demonstrating Ms. Shields had a sufficient amount of experience and training as a SANE nurse to offer opinion testimony based upon her own experiences and perceptions. Importantly, Ms. Shields did not diagnose B.O. as having a

"memory" issue, she simply indicated, based upon her own experience treating victims, that a victim's memories are "very subjective to each traumatization."

{¶15} We note, in *State v. Kamer*, 6th Dist. Wood No. WD-20-084, 2022-Ohio-2070, ¶ 110-117, the SANE nurse testified generally about her education and training, without any testimony about what she learned in the course of her education and training regarding the anatomy and healing process of child rape victims. The SANE nurse, in *Kamer*, made specific findings regarding the speed at which a vaginal injury heals, the hymen, and the origin of urinary tract infections without the proper foundation to show she "had a sufficient amount of experience and training and that her testimony [] was based on her personal knowledge and experience." *Id*. at ¶ 117, quoting *Belle* at ¶ 48. Thus, although Mr. Cleavenger argues otherwise, *Kamer* is distinguishable from *Belle* and the present matter.

{¶16} As such, Ms. Shield's testimony fell within the ambit of Evid.R. 701's requirement that the lay opinion be rationally based on firsthand observations and helpful in determining a fact in issue. Thus, the trial court did not err in admitting Ms. Shields' above-referenced testimony.

{¶17} Accordingly, Mr. Cleavenger's first assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

**THE TRIAL COURT ERRED WHEN IT EXCLUDED EVIDENCE OF [K.T.'S] PAST ACTS.**

**ASSIGNMENT OF ERROR IV**

**THE TRIAL COURT ERRED WHEN IT PERMITTED THE PROSECUTION TO ELICIT TESTIMONY ABOUT A PAST ACT OF [MR.] CLEAVENGER.**

{¶18} In his second and fourth assignments of error, Mr. Cleavenger argues the trial court erred in excluding evidence of K.T.'s other acts and in allowing the State to elicit testimony regarding a past incident involving B.O. and Mr. Cleavenger. Specifically, in his second

assignment of error, Mr. Cleavenger argues the trial court erred in excluding evidence that K.T. assaulted B.O. in 2012, and that K.T. assaulted two other women in 2007 and 2011. Moreover, in his fourth assignment of error, Mr. Cleavenger argues the trial court erred in allowing testimony regarding a past incident between himself and B.O., which resulted in B.O. making a police report and changing the locks on her home.

{¶19} "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22.[4] Evid.R. 404(B) provides that:

> Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. The proponent of evidence to be offered under this rule shall:
>
> (a) provide reasonable notice of any such evidence the proponent intends to introduce at trial so that an opposing party may have a fair opportunity to meet it;
>
> (b) articulate in the notice the permitted purpose for which the proponent intends to offer the evidence, and the reasoning that supports the purpose; and
>
> (c) do so in writing in advance of trial, or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

"The key is that the evidence must prove something other than the defendant's disposition to commit certain acts. Thus, while evidence showing the defendant's character or propensity to

---

[4] Mr. Cleavenger now argues, for the first time on appeal, the trial court should have applied the federal "reverse 404(B)" doctrine, which allows the admission of other acts evidence, as to third parties, if it "survives an Evid.R. 403 balancing test." We decline to address this argument, however, as "[i]issues not raised in the lower court * * * cannot be raised for the first time on review." *See Republic Steel Corp. v. Bd. of Revision of Cuyahoga Cnty.*, 175 Ohio St. 179 (1963).

commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Hartman* at ¶ 22.

{¶20} In *State v. Ali*, 9th Dist. Summit No. 29611, 2021-Ohio-4596, ¶ 8-9, this Court quoted *Hartman*, stating:

> [I]t is not enough for the proponent of the other-act evidence simply to point to a purpose in the permitted list and assert that the other-act evidence is relevant to it. The rule is concerned not only with the ultimate justification for admitting the evidence but also with the chain of reasoning that supports the non-propensity purpose for admitting the evidence. To properly apply the rule, then, courts must scrutinize the proponent's logic to determine exactly how the evidence connects to a proper purpose without relying on any intermediate improper-character inferences.
>
> * * * [I]n Evid.R. 404(B) cases, the inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant to the particular purpose for which it is offered. The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties. In addition, there must be substantial proof that the alleged similar act was committed by the defendant. Finally, the trial court must determine whether the proffered evidence-though admissible under Evid.R. 404(B)-is nevertheless more prejudicial than probative. Balancing the risks and benefits of the evidence necessarily involves an exercise of judgment; thus, the trial court's determination should be reviewed for an abuse of discretion." *Id*. at ¶ 30. In order to minimize the risk of unfair prejudice, "a court should explain both the specific purpose for which the evidence may be considered and the rationale for its admission on the record[ ]" and the court should provide "an appropriate jury instruction geared toward the specific purpose for which the evidence has been admitted * * *.

(Internal quotations and citations omitted.)

**K.T.'S Other Acts**

{¶21} As indicated above, Mr. Cleavenger sought to introduce other acts evidence, as to K.T., relating to a seven-year removed incident involving B.O. and K.T., and two incidents involving K.T. and other women. Mr. Cleavenger argued these other acts were admissible, pursuant to Evid.R. 404(B), to prove "identity" because K.T. punched these women in the face, which was similar to one of B.O.'s injuries in this matter. In his motion in limine, Mr. Cleavenger

stated "the evidence of [K.T.'s] past acts of violence against women and specifically intimate partners is relevant to demonstrate that he and not the accused committed the alleged crimes at issue." Further, Mr. Cleavenger contended:

> When evidence is admitted to show identity, the theory is to show that the other act(s) and charged crime(s) *have some uniquely identifiable characteristics, or are signature crimes.* [K.T.'s] past acts surrounding domestic violence and assault have similar uniquely identifiable characteristics to the present case. Furthermore, the injuries to [K.T.'s] past victims are similar to the injuries presented by [B.O.] in the present case.

(Emphasis added.)

{¶22} As indicated above, Mr. Cleavenger sought to have K.T.'s other acts evidence admitted under the exceptions listed in Evid.R. 404(B), which include identity. Mr. Cleavenger intended to show K.T.'s "modus operandi," or that K.T.'s "past acts surrounding domestic violence and assault have similar uniquely identifiable characteristics to the present case." In *Hartman* at ¶ 37, the Supreme Court of Ohio explained:

> Modus operandi literally means method of working. It is evidence of signature, fingerprint-like characteristics unique enough to show that the crimes were committed by the same person. Evidence of modus operandi is relevant to prove identity: Evidence that the defendant had committed uncharged crimes with the same peculiar modus tends to identify the defendant as the perpetrator of the charged crime.

(Internal quotations and citations omitted.) Further, the *Hartman* Court determined that evidence of a prior rape "committed against a female sleeping in a bed is hardly unique to [Mr.] Hartman as a perpetrator" in the present rape offense, where he also raped a female sleeping in a bed. *Id.* at ¶ 38.

{¶23} Here, like in *Hartman* at ¶ 37, the past violent acts of K.T. against former intimate partners, including B.O., do not create "signature, fingerprint-like characteristics unique enough to show" that B.O. was assaulted by K.T., instead of Mr. Cleavenger. These prior acts occurred

in 2007, 2011, and 2012, and, while the 2011 and 2012 incidents involved intoxication and an injury to the victim's right eye, the 2007 incident did not include this type of injury. Moreover, in this case, B.O.'s injuries were extensive and not limited to just her right eye. As indicated by the investigative photographs and in the medical records, B.O. had bruising on her face, wrist, torso, back, legs, and feet, as well as a bloodied lip, broken nose, concussion, and swelling. B.O.'s right eye was swollen shut. B.O. also testified Mr. Cleavenger "strangled" her, causing bruising to her neck and collar bone. Ms. Shields, the SANE nurse, described B.O.'s injuries as "the worst injuries that [she has] seen on a domestic violence patient since [she has] been working." During this assault, B.O. was naked, without blankets, in her children's bedroom and Mr. Cleavenger photographed her, in this vulnerable position, with the camera on his cellular phone.

**{¶24}** Thus, because the proffered evidence of K.T.'s past violent acts are not relevant to show modus operandi or identity in this matter, the trial court did not err, pursuant to Evid.R. 404(B), in excluding this evidence.[5]

---

[5] We note that, although the trial court excluded the other acts evidence relating to K.T., B.O. admitted on cross-examine that she and K.T. were involved in a prior incident, one time, "where we had gotten into an argument and it got pretty heated and the cops got called." Further, K.T., during direct examination, admitted he had a criminal history for trafficking in marijuana and receiving stolen property, and, on cross-examination, K.T. admitted he was arrested for "domestic violence against [B.O.] in 2012." Mr. Cleavenger's counsel also asked K.T. a series of questions regarding whether he, in fact, assaulted B.O. on January 1, 2019, and K.T. denied any involvement in the assault. Thus, even if the trial court had erred in excluding the other acts evidence, Mr. Cleavenger was not prejudiced.

**Mr. Cleavenger's Other Act**

{¶25}  Mr. Cleavenger also challenges the trial court's allowance of testimony relating to B.O. changing her locks, in 2018, after an incident with Mr. Cleavenger that resulted in the generation of a police report.  The State explained it only questioned B.O. about whether a police report existed because, in his opening statement, Mr. Cleavenger's counsel told the jury:

> When the prosecutor mentioned to you about [B.O.] changing the locks, we'll ask the officers that when they're on the stand, that hasn't been said to them; *that wasn't in any single police report*; that wasn't in a single one of her statements, that she changed the locks on [Mr. Cleavenger].

(Emphasis added.)  During B.O.'s direct examination, the State elicited the following testimony:

* * *

[The State]:  Tell us about that, how long did you [and Mr. Cleavenger] date?

[B.O.]:  For about two years.  Like I said, we had a couple of times we had split up and got back together.

* * *

[The State]:  Now, there was an incident that had occurred that created an issue between the two of you, would that be a fair statement?

[B.O.]:  Yes.

[The State]:  Without going into surrounding circumstances and the facts, you ended upon calling the police; correct?

[B.O.]:  Yes.

[The State]:   Did you make a police report?

[B.O.] Yes.

[The State]:  You did?  And that would have been on May 28[], 2018?

[B.O.]:  Yes.

* * *

At this time, Mr. Cleavenger's counsel objected and a sidebar discussion was held out of the presence of the jury. Mr. Cleavenger's counsel asked, "[w]hy are we talking about a prior police report that [B.O.] filed in May of 2018?" In response the State indicated this is not other act evidence, "[i]t just explains why [B.O.] did what she did with respect to changing the locks." Mr. Cleavenger's counsel continued, stating, "I don't know why we have to talk about a police report." The trial court then instructed the State: "[a]ll right. Very briefly. Get out of it." Following Mr. Cleavenger's objection and the trial court's directive, there was no further mention of the 2018 police report, nor were any details of the incident or police report disclosed to the jury. Additionally, the police report was not submitted to the jury as part of the State's evidence. Instead, B.O. explained that, after the incident, Mr. Cleavenger no longer had keys to her home, even though they sporadically continued dating.

{¶26} The State, in eliciting this testimony from B.O., was not attempting to submit other acts evidence to prove Mr. Cleavenger's propensity toward violence. Instead, the State set out to show that [B.O.] changed her locks and Mr. Cleavenger was not entitled to enter her home without permission. Further, the record reveals Mr. Cleavenger did not object to testimony regarding B.O. changing the locks, but objected only to testimony regarding the 2018 police report. As such, because contents of the police report were not disclosed to the jury, and the State adhered to the trial court's directive to "get out of" this line of questioning, the trial court did not err in allowing B.O.'s limited testimony on this issue.

{¶27} Accordingly, Mr. Cleavenger's second and fourth assignments of error are overruled.

## ASSIGNMENT OF ERROR III

**THE TRIAL COURT ERRED WHEN IT FORBADE [MR.] CLEAVENGER FROM PRESENTING GENERAL EXPERT TESTIMONY ON BATTERED WOMAN SYNDROME.**

{¶28} In his third assignment of error, Mr. Cleavenger argues the trial court abused its discretion in precluding Mr. Cleavenger from presenting generalized expert testimony regarding battered-woman syndrome to support the defense theory that B.O. accused Mr. Cleavenger of assault, instead of the actual aggressor, K.T., the father of B.O.'s children who had assaulted her in the past. We disagree.

{¶29} The Supreme Court of Ohio, in *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, addressed the following certified question regarding battered-woman syndrome: "[w]hen the victim's credibility is challenged upon cross-examination during the state's case-in-chief, may the state introduce evidence of battered woman syndrome to demonstrate the victim's state of mind, i.e., to explain why she returned to the defendant despite his aggressions toward her?" *Id*. at ¶ 28. In addressing this question, the Supreme Court began with an overview of the syndrome as described during the Haines' trial by Dr. James Eisenberg, a board-certified forensic psychologist:

> Dr. Eisenberg testified about battered-woman syndrome, stating that "it refers to a woman * * * that is the subject of repeated psychological, physical, or sexual abuse by one's partner. The syndrome itself speaks to the individuals who remain in relationships in spite of those beatings." He explained the syndrome's three-part process-the tension stage, the acute battering stage, and the stage of contrition. He stated that the batterer exerts extreme control over the woman's entire life, leading to her isolation. He explained that a woman in a relationship with a batterer sees the world "through a very small opening and all that she sees is this guy. * * * The threat is always there, whether you leave or whether you stay. * * * So the threat is always there, it doesn't matter if they go anywhere. [She thinks], [i]f I leave he's gonna beat me. If I stay he's gonna beat me. Let me just-let's just get it out."

*Id*. at ¶ 14.

**{¶30}** The *Haines* Court then engaged in an historic overview relating to the admissibility of testimony, in Ohio, regarding battered-woman syndrome. In so doing, the *Haines* Court extended the holding in S*tate v. Koss*, 49 Ohio St.3d 213 (1990), as follows:

> In *State v. Koss* [], this [C]ourt first recognized the admissibility of expert testimony regarding battered-woman syndrome. In that case, the defendant had killed her husband, and the testimony regarding battered-woman syndrome was offered by the defendant in support of her affirmative defense of self-defense. Today's certified question asks whether that holding should be extended to allow expert testimony concerning battered-woman syndrome in the state's case-in-chief to help a jury understand a victim's reaction to abuse in relation to her credibility. We hold that such testimony is admissible.

*Haines* at ¶ 29. Further, the *Haines* Court explained the methodology for analyzing whether case-specific testimony regarding battered-woman syndrome is admissible under the Ohio Rules of Evidence. The *Haines* Court stated:

> *Koss* and R.C. 2901.06(A)[6] establish that battered-woman-syndrome testimony meets the requirements of Evid.R. 702 in regard to scientific validity and the requirement of specialized knowledge. Neither *Koss* nor R.C. 2901.06 nor R.C. 2945.392 limits the use of such testimony to self-defense or insanity cases. *Koss* and the statutes do recognize that testimony on the syndrome is properly admitted pursuant to Evid.R. 702 as expert testimony that can assist the trier of fact in search of the truth. [] But admissibility under Evid.R. 702 is only part of the picture-as R.C. 2901.05 and 2945.392 both require, any battered-woman-syndrome testimony must be admitted in conformance with the Ohio Rules of Evidence. Thus, our consideration of admissibility does not end with Evid.R. 702.

---

[6] R.C. 2901.06(A), states:

The general assembly hereby declares that it recognizes both of the following, in relation to the "battered woman syndrome:"

(1) That the syndrome currently is a matter of commonly accepted scientific knowledge;

(2) That the subject matter and details of the syndrome are not within the general understanding or experience of a person who is a member of the general populace and are not within the field of common knowledge.

* * *

Relevance under Evid.R. 401 is the first hurdle to clear. "Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse." Such seemingly inconsistent actions are relevant to a witness's credibility. "Because the victim's credibility can be attacked during cross-examination of the victim or even during opening statements, the prosecution need not wait until rebuttal to present expert testimony on battered woman syndrome. Rather, such testimony may be presented as rehabilitative evidence during the state's case-in-chief."

* * *

"Expert testimony on the subject of battered woman's syndrome is not relevant unless there is some evidentiary foundation that a party or witness to the case is a battered-woman, and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior."

* * *

Even when its relevance is shown through a proper foundation, a court must carefully weigh whether the expert testimony violates Evid.R. 403(A), which states, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

* * *

(Internal citations omitted.) *Haines* at ¶ 42- 46, 54.

{¶31} Here, in precluding the testimony of Mr. Cleavenger's expert regarding battered-woman syndrome, the trial court stated:

* * *

[Mr. Cleavenger] has made a novel argument, has made extraordinary efforts to argue for the allowance of this expert testimony; however, the [c]ourt finds the testimony is not admissible under the circumstances of this case.

* * *

I'm going to assume for purposes of this analysis that expert testimony may be relevant to explain a battered woman accusing someone other than her batterer of inflicting her injuries.

I'm also going to assume that if [B.O.] came in to testify, [Mr. Cleavenger] could show the two cycles necessary to establish that [B.O.] was a battered woman in her relationship with [K.T.].

Now again, that's an assumption, I'm not sure that that would happen should [B.O.] testify.

Even with those assumptions, however, the [c]ourt finds that expert testimony related to [] [b]attered[-] [w]oman[] [s]yndrome is not admissible.

The other requirements simply cannot be met.

The evidence is not being used to rehabilitate the credibility of [B.O.]

It would be used in this case to attack the credibility of [B.O.]

Also, under *Haines*, evidence related to [] [b]attered[-] [w]oman [] syndrome has to provide a possible explanation for [B.][O.]'s actions, an explanation for something that we know that she actually did.

There's nothing in this case that we know actually happened that needs to be explained.

[Mr. Cleavenger] is seeking to use [this] testimony to give a *possible reason for something that it can only theorize has happened*.

That is fundamentally different.

*Haines* allowed the testimony to explain *why* the battered woman returned to her abuser after the first charged incident, that is a fact that was in evidence, a fact that the evidence showed actually happened in that case, and was allowed to rehabilitate [the victim's] credibility and explain why that made sense, given her state of mind as a battered woman.

Here it is [Mr. Cleavenger's] intention to use [expert] testimony to show that it is not uncommon for battered women to make excuses or even blame someone else for her injuries and then theorize that [B.O.] is wrongly blaming Mr. Cleavenger for her injures and use that to explain why she might be fabricating evidence if she actually is, but this is only a theory. It is not a fact.

* * *

Finally, it is the jury's province to judge the credibility of the witnesses, including [B.O.], and I do not find that allowing expert testimony to explain [b]attered[-] [w]oman[] [s]yndrome would assist them in doing so where none of her [] actions need[] to be explained.

[B.O.] has not changed her story, or first blamed [K.T.] and then changed to blaming Mr. Cleavenger.

[Mr. Cleavenger] can use ordinary means of arguing the credibility of [B.O.'s] story * * * naming her alleged attacker in this case.

* * *

(Emphasis added.)

{¶32} As indicated in *Haines*, *supra*, at ¶ 44, "[r]elevance under Evid.R. 401 is the first hurdle to clear[,]" relating to the admissibility of expert testimony regarding battered-woman syndrome. Evid.R. 401 states: "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Additionally, "[e]xpert testimony on the subject of battered[-]woman[] syndrome is *not relevant* unless there is some evidentiary foundation that a party or witness to the case is a battered-woman, *and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior*." (Emphasis added.) *Haines* at ¶ 46.

{¶33} The record, in this matter, reveals B.O. never changed her position that Mr. Cleavenger assaulted her in the early morning hours of New Year's Day. B.O. told her neighbor, the police, Ms. Shields, and K.T., that Mr. Cleavenger assaulted her when she returned home from the bar. As such, this is not a situation where expert testimony regarding battered-woman syndrome could assist the jury in understanding B.O.'s behavior. Moreover, although Mr. Cleavenger *theorizes*, as part of his defense, that B.O. blamed him instead of K.T. due to the effects of battered-woman syndrome, there is no "fact" in evidence that this testimony could make more

or less probable. *See* Evid.R. 401. As such, the expert testimony relating to battered-woman syndrome is not relevant and the trial court did not err in its exclusion. *See* Evid.R. 402 ("Evidence which is not relevant is not admissible.")

{¶34} Accordingly, Mr. Cleavenger's third assignment of error is overruled.

## ASSIGNMENT OF ERROR V

**THE MULTIPLE ERRORS CUMULATIVELY DEPRIVED MR. CLEAVENGER OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.**

{¶35} In his fifth assignment of error, Mr. Cleavenger argues he is entitled to a new trial pursuant to the cumulative error doctrine.

{¶36} "Under the cumulative error doctrine, a conviction may be reversed when the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial even though none of the errors, in isolation, [were] prejudicial." *State v. Smith*, 9th Dist. Summit No. 26159, 2012-Ohio-4436, ¶ 23, citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "In the absence of multiple errors, the cumulative error doctrine does not apply." *Id*.

{¶37} Here, as indicated above, Mr. Cleavenger has not identified multiple errors in the trial court proceedings, so it cannot be said that cumulative errors deprived him of a fair trial. *See State v. Taylor*, 9th Dist. Lorain No. 09CA009570, 2010-Ohio-962, ¶ 40.

{¶38} Accordingly, Mr. Cleavenger's fifth assignment of error is overruled.

III.

{¶39} For the foregoing reasons, Mr. Cleavenger's five assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETTY SUTTON
FOR THE COURT

CALLAHAN, J.
CONCURS.

TEODOSIO, P. J.
DISSENTING.

{¶40} I respectfully dissent from the majority's opinion with regard to the first assignment of error. I would conclude that Ms. Shield's opinion testimony regarding memory timelines and flashbacks was based upon specialized knowledge within the scope of Evid.R. 702 and not merely

upon her perception.  *See* Evid.R. 701.  Accordingly, I would conclude the trial court erred in admitting the testimony.


APPEARANCES:

MAX HERSCH, Assistant State Public Defender, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.